# IN THE SUPREME COURT OF IOWA

No. 23–1145

Submitted April 11, 2024—Filed June 28, 2024

**PLANNED PARENTHOOD OF THE HEARTLAND, INC., EMMA GOLDMAN CLINIC,** and **SARAH TRAXLER,**

Appellees,

vs.

**KIM REYNOLDS** ex rel. **STATE OF IOWA,** and **IOWA BOARD OF MEDICINE,**

Appellants.

---

Appeal from the Iowa District Court for Polk County, Joseph Seidlin, Judge.

In a case challenging the constitutionality of a law prohibiting abortion after a fetal heartbeat is detected, the defendant state officials appeal the district court's granting of a temporary injunction blocking enforcement of the law. **REVERSED AND REMANDED.**

McDermott, J., delivered the opinion of the court, in which McDonald, Oxley, and May, JJ., joined. Christensen, C.J., filed a dissenting opinion, in which Mansfield and Waterman, JJ., joined. Mansfield, J., filed a dissenting opinion, in which Christensen, C.J., and Waterman, J., joined.

Brenna Bird, Attorney General; Eric Wessan (argued), Solicitor General; and Daniel Johnston, Assistant Attorney General, for appellants.

Peter Im (argued) of Planned Parenthood Federation of America, Washington, D.C.; Rita Bettis Austen of American Civil Liberties Union of Iowa Founda-

tion, Des Moines; Caitlin Slessor and Samuel E. Jones of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids; and Dylan Cowit and Anjali Salvador of Planned Parenthood Federation of America, New York, New York, for appellees.

John Eidsmoe, Montgomery, Alabama, for amici curiae Foundation for Moral Law and Lutherans for Life.

David E. Fowler of Constitutional Government Defense Fund, Franklin, Tennessee, and Justin Reid of Reid Law Firm PLLC, Des Moines, for amici curiae 32 State Family Policy Councils and Family Policy Alliance.

Christopher E. Mills of Spero Law LLC, Charleston, South Carolina, and Timm Reid of Reid Law Firm PLLC, Des Moines, for amicus curiae American College of Pediatricians.

Peter M. Sand, West Des Moines, for amicus curiae American Association of Pro-Life Obstetricians and Gynecologists.

D. John Sauer of James Otis Law Group, LLC, St. Louis, Missouri, and Daniel A. Dlouhy of Dlouhy Law, PC, East Dubuque, Illinois, for amicus curiae Alliance for Hippocratic Medicine.

Theodore E. Rokita, Indiana Attorney General; James W. Barta, Indiana Deputy Solicitor General; and Thomas M. Bright, Indiana Deputy Attorney General, Indianapolis, Indiana, for amici curiae State of Indiana and 16 Other States.

Ryan Benn, Indianola, and Mario Diaz, Alexandria, Virginia, for amicus curiae Concerned Women for America.

Christopher P. Schandevel, John J. Bursch, and Erin M. Hawley, Lansdowne, Virginia; Noah H. Ridgway of Hagenow Gustoff & Karas LLP, Des Moines; and Jacob Phillips, Orlando, Florida, for amicus curiae Alliance Defending Freedom.

Chuck Hurley of the Family Leader, Urbandale, and Olivia F. Summers, Washington, D.C., for amici curiae 45 Members of the Iowa Legislature and the American Center for Law & Justice.

Alan R. Ostergren, Des Moines, for amicus curiae the Kirkwood Institute, Inc.

Roxanne Barton Conlin and Devin C. Kelly of Roxanne Conlin & Associates, P.C., Des Moines, for amicus curiae Interfaith Alliance of Iowa.

Joshua S. Opperman and Sonci Kingery, Des Moines, for amici curiae Iowa Coalition Against Domestic Violence and Iowa Coalition Against Sexual Assault.

Sarah E. Wilson of Sarah E. Wilson Law Firm, PLC, Ankeny, and Julie E. Fink and Selena Kitchens of Kaplan Hecker & Fink LLP, New York, New York, for amicus curiae The National Infertility Association.

Laura Schultes of RSH Legal, Cedar Rapids, and Jayme Jonat and Charlotte Baigent of Holwell Shuster & Goldberg LLP, New York, New York, for amicus curiae Medical Students for Choice.

Scott M. Brennan, Tyler L. Coe, and Katelynn T. McCollough of Dentons Davis Brown, Des Moines; Diane Siegel Danoff and Christopher J. Merken of Dechert LLP, Philadelphia, Pennsylvania; and Nina S. Riegelsberger of Dechert LLP, New York, New York, for amici curiae Non-Iowan Abortion Care Providers.

Nicole A. Saharsky of Mayer Brown LLP, Washington, DC, and Dane Schumann of Capitol Counsel, P.L.L.C., Urbandale, for amici curiae American College of Obstetricians and Gynecologists, American Medical Association, Society for Maternal-Fetal Medicine, Society of Family Planning, and American Society for Reproductive Medicine.

**MCDERMOTT, Justice.**

The State asks us to dissolve a temporary injunction blocking enforcement of a statute that prohibits physicians, with certain exceptions, from performing an abortion after detecting a fetal heartbeat. In granting the injunction, the district court applied an "undue burden" test and concluded that the petitioners were likely to succeed in their constitutional substantive due process challenge. The State asks us to dissolve that injunction, arguing that the district court applied the wrong constitutional test and that the court must instead review the abortion restriction under the less demanding "rational basis" test.

When a party alleges that a statute violates a due process right, the nature of the individual right at stake dictates the constitutional test that the court applies. Under our well-established tiers of scrutiny, if the government action implicates a "fundamental" right, we apply the strict scrutiny test and determine whether the government's action is narrowly tailored to serve a compelling government interest. But if the right at stake is not a fundamental right, then we apply the rational basis test and determine whether the law is rationally related to a legitimate state interest.

We have previously held that abortion is not a fundamental right under the Iowa Constitution. *See Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State* (*PPH 2022*), 975 N.W.2d 710, 740 (Iowa 2022). Applying our established tiers of scrutiny, we hold that abortion restrictions alleged to violate the due process clause are subject to the rational basis test. Employing that test here, we conclude that the fetal heartbeat statute is rationally related to the state's legitimate interest in protecting unborn life. We thus reverse the district court order entering the temporary injunction blocking enforcement of the fetal heartbeat statute and remand for further proceedings.

I.

The law challenged in this case bars most abortions when there is a "detectable fetal heartbeat." Iowa Code § 146E.2(2)(*a*) (2023). Under this statute, a physician must perform an abdominal ultrasound to detect cardiac activity and "shall inform the pregnant woman, in writing," whether any cardiac activity was detected and, if so, that "an abortion is prohibited." *Id.* § 146E.2(1)(*b*)(1)–(2). The pregnant woman must sign a form acknowledging receipt of this information. *Id.* § 146E.2(1)(*c*).

The statute includes exceptions that allow an abortion after detection of a fetal heartbeat if there is a medical emergency or if the pregnancy resulted from rape or incest. *Id.* §§ 146E.1(3)–(4), .2(2)(*a*). The medical emergency exception allows an abortion to "preserve the life of the pregnant woman whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy." *Id.* § 146A.1(6)(*a*); *id.* § 146E.1(4). For the rape exception to apply, the rape must be "reported within forty-five days of the incident to a law enforcement agency or to a public or private health agency which may include a family physician." *Id.* § 146E.1(3)(*a*). The incest exception applies if the incest "is reported within one hundred forty days of the incident to a law enforcement agency or to a public or private health agency which may include a family physician." *Id.* § 146E.1(3)(*b*).

Abortions are almost entirely prohibited when a fetal heartbeat is detected after twenty or more weeks. *See id.* § 146E.2(2)(*b*). The only exceptions after that date are when "in the physician's reasonable medical judgment the pregnant woman has a condition which the physician deems a medical emergency" or when "the abortion is necessary to preserve the life of an unborn child." *Id.*

This statute came into being after Governor Kim Reynolds called a special session of the Iowa Legislature for "the sole purpose of enacting legislation that

addresses abortion and protects unborn lives." Press Release, Off. of the Governor of Iowa, *Gov. Reynolds Calls Special Session to Enact Pro-life Legislation* (July 5, 2023), https://governor.iowa.gov/press-release/2023-07-05/gov-reynolds-calls-special-session-enact-pro-life-legislation [https://perma.cc/7YLY-YDD9]. On July 11, 2023, at that special session, the legislature passed a fetal heartbeat bill nearly mirroring an earlier fetal heartbeat statute enacted in 2018. *Compare* 2023 Iowa Acts ch. 1, §§ 1–2 (codified at Iowa Code §§ 146E.1, .2 (2024)), *with* 2018 Iowa Acts ch. 1132, §§ 3–4 (codified at Iowa Code §§ 146C.1, .2 (2019)). Governor Reynolds announced her plan to sign the bill at an event on July 14.

On July 12, Planned Parenthood of the Heartland, Emma Goldman Clinic, and Sarah Traxler, M.D. (collectively, "Planned Parenthood"), filed a petition for declaratory judgment and injunctive relief. They named as defendants Governor Reynolds and the Iowa Board of Medicine (together, "the State"). The petition for declaratory judgment alleged that the fetal heartbeat statute violated three provisions in the Iowa Constitution: the due process clause in article I, § 9; the "inalienable rights" clause in article I, § 1; and the equal protection clause in article I, §§ 1 and 6. That same day, Planned Parenthood also moved for an emergency temporary injunction. Its motion asked the district court to block enforcement of the statute until the court could rule on the merits of the constitutional challenge. The district court held a hearing on the motion on July 14—the same day that Governor Reynolds signed the fetal heartbeat statute into law.

On July 17, the district court held that Planned Parenthood had standing to bring its claims, the case was ripe, and that an injunction should be issued barring the State from enforcing the fetal heartbeat law until a final ruling in the case. The district court also ordered that the Iowa Board of Medicine, which is

tasked with creating administrative rules to implement the statute, should nevertheless proceed with rulemaking. The State sought interlocutory review of the district court order, which we granted.

II.

The order challenged in this appeal was not a final judgment on the merits but rather an order granting a motion for temporary injunction. The State argues that the district court erred in its analysis and asks us to dissolve the temporary injunction. Although the district court discussed several considerations when deciding whether to grant the temporary injunction, both the district court in its order and the parties in their briefs focus on whether Planned Parenthood can show a "likelihood of success on the merits." *Max 100 L.C. v. Iowa Realty Co.*, 621 N.W.2d 178, 181 (Iowa 2001) (en banc). For a court to enter a temporary injunction, the parties requesting it must convince the court that they are likely to succeed at the conclusion of the case after all the evidence is heard. *League of United Latin Am. Citizens of Iowa v. Pate*, 950 N.W.2d 204, 208–09 (Iowa 2020) (per curiam). Temporary injunctions are equitable remedies intended to prevent irreparable harm from occurring before the court has had a chance to determine if the alleged legal wrong occurred. *Id.* at 209. There's no basis to provide a temporary remedy if a plaintiff cannot show a likelihood of success in ultimately proving that legal wrong. *Id.*

Whether Planned Parenthood can show a likelihood of success on the merits depends heavily on the test the court applies to determine whether the statute infringes a constitutional right. A brief review of our court's recent opinions involving challenges to abortion restrictions sets the stage for our analysis.

A.

In 2015, we addressed a challenge to an administrative rule that restricted "telemedicine abortions" by requiring physicians to perform a physical examination on pregnant patients before providing an abortion and to be physically present with them when an abortion drug is administered. *See Planned Parenthood of the Heartland, Inc. v. Iowa Bd. of Med.* (*PPH 2015*), 865 N.W.2d 252, 253 (Iowa 2015). Under the "undue burden" test created in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, federal law at the time prohibited abortion restrictions that had "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." 505 U.S. 833, 877–79 (1992) (plurality opinion). We made no determination in *PPH 2015* whether the Iowa Constitution provided an independent right to obtain an abortion, accepting instead the Iowa Board of Medicine's concession that any state constitutional right was "coextensive with the right available under the United States Constitution." 865 N.W.2d at 254. Applying the federal undue burden standard, we held that the statute violated due process. *Id.* at 269.

In 2018, the legislature passed a statute prohibiting abortion "when it has been determined that the unborn child has a detectable fetal heartbeat, unless, in the physician's reasonable medical judgment," one of several exceptions applies. 2018 Iowa Acts ch. 1132, § 4 (codified at Iowa Code § 146C.2(2) (2019)). Planned Parenthood filed a petition for declaratory judgment and for an injunction to prevent enforcement of the statute. The State stipulated to the temporary injunction, but it continued to litigate the underlying constitutional issues, arguing in a motion to dismiss that the Iowa Constitution did not protect a right to abortion.

While that motion awaited a ruling in the district court, we issued an opinion in a different case challenging the constitutionality of a separate statute that

imposed a seventy-two-hour waiting period between appointments with a physician before the physician could perform an abortion. *See Planned Parenthood of the Heartland v. Reynolds ex rel. State* (*PPH 2018*), 915 N.W.2d 206, 212 (Iowa 2018). In determining the type of right at issue—and thus the constitutional standard of review for the challenged statute—we held that abortion was a fundamental right under the Iowa Constitution. *Id.* at 237. We applied the test associated with fundamental rights—the "strict scrutiny" test—to the seventy-two-hour waiting period and held that the statute violated both the due process and equal protection clauses of the Iowa Constitution. *Id.* at 241–244, 244–46. Two justices dissented. *Id.* at 246 (Mansfield, J., dissenting, joined by Waterman, J.). The dissent argued that declaring abortion a fundamental right under the Iowa Constitution lacked both a textual and historical basis. *Id.* at 246–47. The dissent would have applied *Casey*'s undue burden standard (the federal standard at the time) in analyzing the constitutionality of the waiting period statute. *Id.* at 254.

In the wake of *PPH 2018*, the State withdrew its motion to dismiss, and Planned Parenthood moved for summary judgment. In January 2019, the district court applied strict scrutiny and concluded that the original fetal heartbeat law violated the due process and equal protection clauses of the Iowa Constitution. The district court granted Planned Parenthood's motion for summary judgment and entered a permanent injunction preventing the state from enforcing the statute. The State did not appeal at that time.

In June 2020, the legislature enacted a different waiting period statute that imposed a shorter duration—twenty-four hours—between appointments with a physician before obtaining an abortion. *See PPH 2022*, 975 N.W.2d at 718. Planned Parenthood promptly sued and sought a temporary injunction to block enforcement of the statute. *Id.* at 719. The district court applied *PPH 2018*'s strict

scrutiny standard and determined that the twenty-four-hour waiting period requirement was unconstitutional. *Id.* at 720.

On appeal, we reconsidered *PPH 2018*'s holding that abortion was a fundamental right. *Id.* at 735–36. We noted that other state courts that had recognized a right to abortion under the due process clause of their state constitutions had "overwhelmingly found that the right . . . is no broader than the federal right (if it exists at all)." *Id.* at 738. We concluded that nothing in the text of Iowa's Constitution—whether in the due process clause or elsewhere—refers to or includes protection for abortion. *Id.* at 739–40. And we observed that nothing in our state's historical treatment of abortion, which included outright bans under a series of laws dating to the state's founding, established abortion as a fundamental right. *Id.* at 740–41. We thus declared abortion was not a fundamental right under the due process clause of Iowa's Constitution, overruling *PPH 2018. Id.* at 741, 744. Two justices dissented from this part of the opinion. *Id.* at 750 (Christensen, C.J., concurring in part and dissenting in part); *id.* at 756 (Appel, J., dissenting).

But no majority formed in *PPH 2022* regarding the appropriate standard of review to apply on remand. *See id.* at 744–45 (plurality opinion). A three-justice plurality noted that the State did not take a position on what test should replace the strict scrutiny standard. *Id.* Concluding that "we should not go where the parties do not ask us to go," the plurality left this question open for the parties to litigate further. *Id.* at 745. The plurality also noted that an important abortion case currently before the United States Supreme Court could determine the undue burden test's fate in federal constitutional analysis and could provide insight relevant to our consideration of the issue. *Id.* at 745–46. Two justices who joined the majority opinion overturning *PPH 2018* dissented from the plurality opinion on this point, arguing that our precedents required adoption of the

rational basis test. *Id.* at 749 (McDermott, J., concurring in part and dissenting in part, joined by McDonald, J.).

One week after we decided *PPH 2022*, the United States Supreme Court decided *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). In *Dobbs*, the Supreme Court overruled *Casey* and the undue burden standard under the Federal Constitution. *Id.* at 231. It held that abortion is not a fundamental right and, as a result, abortion restrictions challenged under the Federal Due Process Clause are subject only to rational basis review. *Id.* at 300.

On the heels of *PPH 2022* and *Dobbs*, the State moved in the district court to dissolve the permanent injunction entered in January 2019 that barred enforcement of the original fetal heartbeat law. The State argued that *Dobbs* and *PPH 2022* had produced a substantial change in the law and that no legal basis remained to keep the injunction in place. The district court concluded that it lacked authority to dissolve the injunction, noting that several years had elapsed since the judgment had been entered without an appeal. It further held that even if it had the authority to act, the undue burden test applied, and the fetal heartbeat statute failed this test. The district court thus denied the State's motion to dissolve the permanent injunction. In the State's appeal, we deadlocked 3–3, which affirmed the district court's ruling by operation of law and kept the injunction in place. *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, No. 22–2036, 2023 WL 4635932 (Iowa June 16, 2023) (mem.); *see* Iowa Code § 602.4107.

Governor Reynolds's call for the special legislative session, as described earlier, soon followed, resulting in the enactment of the new fetal heartbeat statute at issue in this appeal. *See* 2023 Iowa Acts ch. 1, §§ 1–2 (codified at Iowa Code §§ 146E.1, .2 (20232024)).

B.

In navigating the unsettled terrain regarding the level of scrutiny to apply in this case, the district court looked principally to *PPH 2022*. It rejected the State's argument that because *PPH 2022* held abortion is not a fundamental right, rational basis review is required under our precedents. The district court examined the differing viewpoints expressed in *PPH 2022*'s plurality opinion and partial dissent, noting that the plurality did not adopt the partial dissent's proposal for rational basis review and the plurality's statement that for the time being "the *Casey* undue burden test we applied in *PPH* [*2015*] remains the governing standard." 975 N.W.2d at 716.

The district court thus applied the undue burden test as the operative standard and concluded that Planned Parenthood had shown a likelihood of success on its claim that the fetal heartbeat statute violates the due process clause of the Iowa Constitution. After finding in favor of Planned Parenthood on this point, the district court did not analyze Planned Parenthood's separate argument that the statute violated the inalienable rights clause in article I, § 1 of the Iowa Constitution, nor did it analyze Planned Parenthood's equal protection claim under article I, §§ 1 and 6 of the Iowa Constitution. The district court briefly addressed two other factors in its injunction analysis—the potential irreparable harm that may result from failing to enter the temporary injunction, and the balance of potential harms to each party—and concluded that both weighed in favor of Planned Parenthood.

III.

A.

Our approach to reviewing constitutional challenges to statutes reflects important separation of powers considerations. The separation of powers among

the branches of government preserves the balance established in the Constitution to prevent "a gradual concentration of the several powers in the same department." *The Federalist No. 51*, at 349 (James Madison) (Jacob E. Cooke ed., 1961). The Iowa Constitution vests the legislature with the authority "to make, alter, and repeal laws and to formulate legislative policy." *In re C.S.*, 516 N.W.2d 851, 859 (Iowa 1994). This authority includes "the legislature's broad, inherent power to pass laws that promote the public health, safety, and welfare." *Gravert v. Nebergall*, 539 N.W.2d 184, 186 (Iowa 1995). The executive power is the authority "to put the laws enacted by the legislature into effect." *In re C.S.*, 516 N.W.2d at 859. The judicial power encompasses "the power to decide and pronounce a judgment" in particular cases. *Klouda v. Sixth Jud. Dist. Dep't of Corr. Servs.*, 642 N.W.2d 255, 261 (Iowa 2002). "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

The legislature's power does not extend to lawmaking that violates a constitutional provision. Our constitution provides that *it* "shall be the supreme law of the State" and any inconsistent law "shall be void." Iowa Const. art. XII, § 1. When a challenged statute encroaches on a constitutional provision, the court has an "imperative duty" to declare the statute inoperative. *McGuire v. Chi., B. & Q. R. Co.*, 108 N.W. 902, 905 (Iowa 1906). But a court may not strike down a statute based on its own disagreement—even deeply held disagreement—with the public policy advanced in the statute.

A court's ability to nullify a law depends entirely on whether a law is irreconcilable with a particular provision of the constitution. As we put the point long ago: "We are not the guardians of the rights of the people of the State unless they are secured by some constitutional provision which comes within our judicial

cognizance. The remedy for unwise or oppressive legislation, within constitutional bounds, is by appeal to the justice and patriotism of the representatives of the people." *Stewart v. Bd. of Supervisors*, 30 Iowa 9, 17 (1870). Legislative majorities are sometimes dreadfully wrong. But our system nevertheless allows them to pursue their will without judicial interference unless their actions invade constitutional protections.

The Iowa Constitution's due process clause provides that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. Determining whether a party's substantive due process rights have been violated, as claimed in this case, involves a two-step analysis. *State v. Laub*, 2 N.W.3d 821, 836 (Iowa 2024). "The first step is to 'identify the nature of the individual right involved' and determine whether that right is fundamental." *State v. Groves*, 742 N.W.2d 90, 92 (Iowa 2007) (quoting *In re Det. of Cubbage*, 671 N.W.2d 442, 446 (Iowa 2003)). "Once we identify the nature of the right, the second step is to apply the appropriate test." *Id.* at 93. "If we determine the right is fundamental, then we will apply strict scrutiny." *Id.* Strict scrutiny requires us to determine whether the government's action is narrowly tailored to serve a compelling government interest. *Sanchez v. State*, 692 N.W.2d 812, 817 (Iowa 2005). On the other hand, "[i]f we determine a fundamental right is not implicated, we apply a rational basis review." *Groves*, 742 N.W.2d at 93. Under the rational basis test, we determine whether the law is "rationally relate[d] to a legitimate government purpose." *Id.*

A fundamental right, as we apply that term in our constitutional analysis, doesn't simply mean "important." *King v. State*, 818 N.W.2d 1, 26 (Iowa 2012). "Many important interests," we have noted, "do not qualify as fundamental rights." *Id.* Some fundamental rights (freedom of speech or the right to trial by jury, for instance) are expressly enumerated in the text of the Constitution. *See*

*District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008). In determining whether an unenumerated right is fundamental, the alleged right at issue must be objectively "deeply rooted" in our "history and tradition" and "implicit in the concept of ordered liberty." *Hensler v. City of Davenport*, 790 N.W.2d 569, 581 (Iowa 2010) (quoting *Chavez v. Martinez*, 538 U.S. 760, 775 (2003) (plurality opinion)). Whether abortion is a fundamental right determines the standard of review we apply.

We answered the question whether abortion is a "fundamental right" in *PPH 2022. See* 975 N.W.2d at 740. In that case, we held that obtaining an abortion is not a fundamental right under the Iowa Constitution, expressly overruling *PPH 2018. Id.* at 740, 742. We first examined the text of the Iowa Constitution. *Id.* We concluded that the text offered "no support for [a] reading of the due process clause as providing fundamental protection for abortion." *Id.* at 740.

We then analyzed the state's treatment of abortion throughout its history. *Id.* A right to an abortion, as the historical record shows, is not rooted at all in our state's history and tradition, let alone "deeply" rooted. *See id.* at 740–41. The deep roots that exist show not protection for abortion rights but common law and statutory prohibitions on abortion from the very beginning through modern times. *Id.* Abortion became a crime in Iowa "just six months after the effective date of the Iowa Constitution—and remained generally illegal until *Roe v. Wade*[, 410 U.S. 113 (1973),] was decided over one hundred years later." *Id.* at 740. "Historically," we concluded, "there is no support for abortion as a fundamental constitutional right in Iowa." *Id.*

Planned Parenthood argues that the fact that women's rights were quite limited early in our state's history but expanded over time undercuts the persuasive force of the historical evidence prohibiting abortion. Yet as we observed in *PPH 2022*, "even as women's rights expanded, the ban on abortion remained

in place until *Roe* superseded it." *Id.* at 741 (citing Iowa Code § 701.1 (1973), imposing criminal penalties of up to five years' imprisonment on anyone who administers a drug or performs a procedure "with intent to produce [a] miscarriage of any woman . . . unless such miscarriage shall be necessary to save her life"). Whether a right to obtain an abortion has deep roots in our state's history is an objective inquiry, *see Hensler*, 790 N.W.2d at 581, and that history supplies no support for abortion as a fundamental right, *PPH 2022*, 975 N.W.2d at 740–41.

As we held in *PPH 2022*, neither text nor history establishes abortion as a fundamental right under the Iowa Constitution. *Id.* at 739–42.

B.

Having determined that the individual right at stake is not a fundamental right, we turn to the appropriate level of scrutiny. *See Groves*, 742 N.W.2d at 93. Since the statute implicates no fundamental right, our precedents would have us apply the rational basis test. *Laub*, 2 N.W.3d at 836; *King*, 818 N.W.2d at 32; *Groves*, 742 N.W.2d at 93. Planned Parenthood argues that we should instead adopt the undue burden test from *Casey*. It contends that the undue burden test would better balance the state's interest in protecting what *Roe* and *Casey* called "fetal life," and what the law now before us describes as an "unborn child," with protecting maternal health and a woman's liberty interest in deciding whether to terminate a pregnancy.

In *Casey*, the Supreme Court reaffirmed several propositions of its holding in *Roe*, including that the Constitution protects a right to an abortion before fetal viability "without undue interference from the State." 505 U.S. at 846. *Casey* further declared that the "State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus," and

that the state *may* restrict abortions after viability if the abortion regulation contains exceptions for pregnancies endangering the mother's life or health. *Id.* Under *Casey*'s undue burden test, an abortion regulation would be held unconstitutional if "its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before" viability. *Id.* at 878. The *Casey* plurality abandoned *Roe*'s "zones of privacy" analysis in favor of a "liberty" interest arising under the due process clause of the Fourteenth Amendment. *Compare Roe*, 410 U.S. at 152, *with Casey*, 505 U.S. at 846–47.

The *Casey* dissenters criticized the "inherently standardless nature" of the undue burden test as permitting judges to inject their own policy preferences when deciding whether a particular restriction creates an undue burden to getting an abortion. 505 U.S. at 992 (Scalia, J., concurring in the judgment in part and dissenting in part). As the dissenters predicted, the undue burden test has vexed courts trying to apply it. *See Dobbs*, 597 U.S. at 284–85 (noting that "*Casey* has generated a long list of Circuit conflicts" and collecting cases). The undue burden test requires judges to determine whether an abortion regulation will "prevent" or "deter" a "significant number of women from obtaining an abortion." *Casey*, 505 U.S. at 893–94. But the test offers no guidance on how much prevention or deterrence will cause an abortion regulation to violate the Constitution. *See Dobbs*, 597 U.S. at 284 ("*Casey*'s 'line between' permissible and unconstitutional restrictions 'has proved to be impossible to draw with precision.' " (quoting *Janus v. AFSCME Council 31*, 585 U.S. 878, 921 (2018))). An undue burden standard inevitably leaves courts unable to provide predictability, consistency, or coherence in its application. We already have well-established tiers of review that we routinely apply when analyzing whether a regulation infringes constitutional due process rights.

Planned Parenthood notes that we have adopted forms of intermediate scrutiny that are more stringent than rational basis but less stringent than strict scrutiny when evaluating burdens imposed by election laws and commercial speech and content-neutral speech regulations. *See Democratic Senatorial Campaign Comm. v. Pate*, 950 N.W.2d 1, 7 (Iowa 2020) (per curiam); *State v. Musser*, 721 N.W.2d 734, 743 (Iowa 2006). But the suggestion that an intermediate standard in these examples somehow supports an intermediate standard for abortion restrictions quickly falls apart when one considers that voting and free speech—unlike abortion—are both fundamental rights enumerated in the Federal and State Constitutions. *See* U.S. Const. amend. I; *id.* amend. XIV, § 2; Iowa Const. art. I, § 7; *id.* art. II, § 1; *see also Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (noting that voting is a matter of "fundamental significance under our constitutional structure" (quoting *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979))). Intermediate scrutiny for election laws, for instance, allows courts to balance competing constitutional requirements of ensuring fair and orderly elections against the right to vote. Abortion is not a fundamental right under either the United States or Iowa Constitutions, *Dobbs*, 597 U.S. at 300; *PPH 2022*, 975 N.W.2d at 740, and thus the legislature generally maintains the authority to regulate it like other activities that fall within the legislature's police powers.

Subjecting all laws that involve legislative line-drawing—which is virtually *all* laws—to heightened scrutiny would severely hamstring the legislature's ability to carry out its role in our democratic process. Our tiers of scrutiny strike a balance between deferring to the legislative process and protecting constitutional rights by holding laws that draw distinctions involving *fundamental* rights to heightened scrutiny. "Our role," as we have said, "is to decide whether constitutional lines were crossed, not to sit as a superlegislature rethinking policy

choices of the elected branches." *AFSCME Iowa Council 61 v. State*, 928 N.W.2d 21, 26 (Iowa 2019).

Stated simply, we can find no principled basis under our due process precedents to apply the heightened scrutiny of an undue burden test to abortion. And it would appear we're not alone in our judgment; in the time since *Dobbs* discarded *Casey*'s undue burden standard, no state appears to have applied the undue burden test to a law restricting abortion based on a state constitution's due process clause.

We thus will apply the rational basis test. "Under a rational basis analysis, a statute is constitutional if we find a 'reasonable fit between the government interest and the means utilized to advance that interest.' " *Groves*, 742 N.W.2d at 93 (quoting *State v. Hernandez–Lopez*, 639 N.W.2d 226, 238 (Iowa 2002)). Rational basis review, while not toothless, presents a "very deferential standard." *AFSCME Iowa Council 61*, 928 N.W.2d at 32 (quoting *NextEra Energy Res. LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 46 (Iowa 2012)). A party challenging a statute under the rational basis test bears "a heavy burden" to show that the state's action is unconstitutional. *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 8 (Iowa 2004). Statutes are presumed constitutional, and we will not declare a law unconstitutional under the rational basis test unless it "clearly, palpably, and without doubt infringe[s]" a constitutional right. *Residential & Agric. Advisory Comm., LLC v. Dyersville City Council*, 888 N.W.2d 24, 50 (Iowa 2016) (alteration in original) (quoting *Racing Ass'n of Cent. Iowa*, 675 N.W.2d at 8).

Planned Parenthood argues that we should not reconsider the constitutional standard in this appeal at all because the parties have not had a chance to fully develop the record. But under the rational basis test, the state "is not required or expected to produce evidence to justify its legislative action." *Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 259 (Iowa 2007). A court

need only find a "realistically conceivable" basis that the statute advances a legitimate state interest. *Hensler*, 790 N.W.2d at 584 (emphasis omitted) (quoting *Miller v. Boone Cnty. Hosp.*, 394 N.W.2d 776, 779 (Iowa 1986) (en banc)). "[T]hat basis need not be supported by evidence in the traditional sense . . . ." *Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67, 86 (Iowa 2022).

The State offers several interests that it asserts are advanced by the fetal heartbeat statute, each of which was recognized by the United States Supreme Court as a legitimate state interest in *Dobbs*: "respect for and preservation of prenatal life at all stages of development"; "protection of maternal health and safety"; "elimination of particularly gruesome or barbaric medical procedures"; "preservation of the integrity of the medical profession"; "mitigation of fetal pain"; and "prevention of discrimination on the basis of race, sex, or disability." 597 U.S. at 301. The state's interest in protecting the unborn can be traced to Iowa's earliest days. *State v. Moore*, 25 Iowa 128, 135–36 (1868).

Every ground the State identifies is a legitimate interest for the legislature to pursue, and the restrictions on abortion in the fetal heartbeat statute are rationally related to advancing them. As a result, Planned Parenthood's substantive due process challenge fails. The district court thus erred in granting the temporary injunction.

## C.

An appellate court may affirm a district court ruling on any ground urged by the successful party in the district court and again on appeal, even if the district court didn't rely on that ground in its ruling. *Veatch v. City of Waverly*, 858 N.W.2d 1, 7 (Iowa 2015). Planned Parenthood argued in the district court that the fetal heartbeat statute violated both the due process clause and the inalienable rights clause. The district court granted the temporary injunction based solely on the due process argument. But Planned Parenthood presents no

inalienable rights clause argument on appeal, urging instead that the district court should rule on it first with a more developed record. Because Planned Parenthood forgoes its inalienable rights argument on appeal, we decline to consider it as an alternative basis to affirm the temporary injunction. We similarly decline to consider Planned Parenthood's claim that the statute violates equal protection, as Planned Parenthood presented no such argument in the injunction proceeding in the district court or in this appeal.

IV.

The State makes two other arguments—challenges to standing and ripeness—seeking not merely to reverse the temporary injunction order but to dismiss the case entirely as improperly brought. It argues that abortion providers such as Planned Parenthood should not be allowed to bring constitutional claims on behalf of women seeking abortions and that permitting them to do so distorts traditional principles of standing. The State also argues that Planned Parenthood's lawsuit is not ripe for review because Planned Parenthood filed it before Governor Reynolds signed the fetal heartbeat statute into law, meaning that there was not yet any law to challenge. The district court rejected both arguments. We agree with the district court that Planned Parenthood has standing and that its claims are ripe for review.

A.

Standing refers to a party's right to bring a legal action. *DuTrac Cmty. Credit Union v. Hefel*, 893 N.W.2d 282, 289 (Iowa 2017). To demonstrate standing, a "party must (1) have a specific personal or legal interest in the litigation and (2) be injuriously affected." *Id.* (quoting *Citizens for Responsible Choices v. City of Shenandoah*, 686 N.W.2d 470, 475 (Iowa 2004)). Although the injury cannot be merely speculative, "a likelihood or possibility of injury" may be enough to establish an injury-in-fact that is sufficiently concrete and imminent to create

standing. *Iowa Bankers Ass'n v. Iowa Credit Union Dep't*, 335 N.W.2d 439, 445 (Iowa 1983).

Although abortion providers have no constitutional right to perform abortions, *see Planned Parenthood of the Heartland, Inc. v. Reynolds*, 962 N.W.2d 37, 56 (Iowa 2021), they nevertheless suffer an injury-in-fact when a statute forbids them from providing abortion procedures, *Singleton v. Wulff*, 428 U.S. 106, 112–113 (1976). Violations of the fetal heartbeat statute could result in revocation of abortion providers' medical licenses and fines of up to $10,000. *See* Iowa Code § 148.6(1)–(2)(*c*); *id.* § 272C.3(2). Planned Parenthood has demonstrated an injury-in-fact under our standing precedents.

The district court also concluded that Planned Parenthood has third-party standing in this case through the pregnant women it serves. Although a party generally may assert only its own rights and not the claims of a third party who isn't before the court, our precedents provide several exceptions to this general rule. *Iowa Movers & Warehousemen's Ass'n v. Briggs*, 237 N.W.2d 759, 772 (Iowa 1976) (en banc). These exceptions include (1) "where a peculiar relationship between the party and the rightholder makes such allowance appropriate," (2) "where the rightholder has difficulty asserting [its] own rights," and (3) "where, unless assertion of the third person's rights were permitted, those rights would be diluted and adversely affected." *Id.*

We agree with the district court that Planned Parenthood's lawsuit satisfies our prudential rules permitting third-party standing in this case. The relationship between abortion providers and women seeking abortions weighs in favor of third-party standing. *See Singleton*, 428 U.S. at 117 (finding providers "uniquely qualified to litigate the constitutionality of the State's interference with" abortion). Further, under the time limitations established in the fetal heart-

beat statute, women seeking an abortion might reasonably have difficulty asserting their own rights in a manner enabling timely adjudication of the important constitutional questions presented in this case. Under these facts, we find that Planned Parenthood satisfies third-party standing requirements. We thus affirm the district court's ruling rejecting the State's standing challenge.

### B.

We turn to the State's ripeness argument. "A case is ripe for adjudication when it presents an actual, present controversy, as opposed to one that is merely hypothetical or speculative." *Barker v. Iowa Dep't of Pub. Safety*, 922 N.W.2d 581, 590 (Iowa 2019) (quoting *State v. Bullock*, 638 N.W.2d 728, 734 (Iowa 2002)). The ripeness doctrine prevents courts from adjudicating cases prematurely and thus "from entangling themselves in abstract disagreements over administrative policies . . . until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* (quoting *State v. Wade*, 757 N.W.2d 618, 627 (Iowa 2008)). Two questions drive our ripeness analysis in this situation: (1) whether the issues are "sufficiently focused so as to permit judicial resolution without further factual development" and (2) whether postponing judicial action would impose a hardship on any party. *Iowa Coal Min. Co. v. Monroe County*, 555 N.W.2d 418, 432 (Iowa 1996).

The legislature passed the fetal heartbeat statute on July 11, 2023. Governor Reynolds issued a statement that same day expressing her intent to sign the bill on July 14. Planned Parenthood filed its petition and motion for temporary injunction on July 12. With Governor Reynolds having called the special legislative session that passed the fetal heartbeat bill and announced the date and location that she would sign the bill, its imminent enactment was all but certain. The fetal heartbeat bill stated that it would become effective immediately. Planned Parenthood presented sufficient evidence that it would suffer hardship,

including potential fines and license revocations, if the district court failed to act right away. The district court, for its part, issued the order granting the temporary injunction on July 17, three days after the statute became effective.

On these facts, we find no error in the district court's conclusion that the case was ripe and thus affirm the district court's ruling rejecting the State's ripeness challenge.

## V.

The district court granted the temporary injunction after concluding that Planned Parenthood was likely to succeed in its constitutional challenge under an undue burden standard. Our holding today—applying rational basis as the constitutional test—undermines the rationale for the district court's ruling. Under the rational basis test, Planned Parenthood cannot show a likelihood of success on the merits of its substantive due process challenge. We thus hold that Planned Parenthood is not entitled to a temporary injunction blocking enforcement of the fetal heartbeat statute. We reverse the order granting the temporary injunction and remand the case for the district court to dissolve the temporary injunction and continue with further proceedings.

**REVERSED AND REMANDED.**

McDonald, Oxley, and May, JJ., join this opinion. Christensen, C.J., files a dissenting opinion, in which Mansfield and Waterman, JJ., join. Mansfield, J., files a dissenting opinion, in which Christensen, C.J., and Waterman, J., join.

CHRISTENSEN, Chief Justice (dissenting).

Today, our court's majority strips Iowa women of their bodily autonomy by holding that there is no fundamental right to terminate a pregnancy under our state constitution. I cannot stand by this decision. The majority's rigid approach relies heavily on the male-dominated history and traditions of the 1800s, all the while ignoring how far women's rights have come since the Civil War era. It is a bold assumption to think that the drafters of our state constitution intended for their interpretation to stand still while we move forward as a society. Instead, we should interpret our constitution through a modern lens that recognizes how our lives have changed with the passage of time.

Historically, "*the men* in the Iowa General Assembly enacted statutes related to abortion, and *the men* reelected the representatives, and *the men* served on the courts, while the women stayed home." *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State* (*PPH 2022*), 975 N.W.2d 710, 793 (Iowa 2022) (Appel, J., dissenting). In sum, generations of women in Iowa faced multiple layers of exclusion and discrimination. Not only did women have no say in the drafting of our state constitution, but they had no input in the statutes being enacted in the state legislature and no ability to vote for the elected officials responsible for these statutes. "Consequently, the common law addressing abortion developed in a society where any rule elevating the continuation of the growth of a fetus was largely untempered by consideration of the impact on the woman who bore the brunt of the rule." *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 309 A.3d 808, 906–07 (Pa. 2024). So is it any wonder why Iowa is not flush with legal history demonstrating that a medical procedure specific to women is a deeply rooted part of our state's tradition?

Women are human beings in their own right, worthy of the same freedoms, privileges, and protections as men. Yet, women have not consistently possessed the same collection of rights granted to men throughout Iowa's history. Instead, society viewed women as little more than an extension of the men in their lives when our state constitution was drafted and for generations to come.[1]

There were no women members of the Iowa constitutional conventions, which occurred in 1844, 1846, and 1857, and no women members of the legislature during that period.[2] While African-American males received the right to vote when the states ratified the Fifteenth Amendment to the United States Constitution in 1870, women of all races had to wait until 1919 for that right.[3] It was not until 1998 that the citizens of Iowa voted to expressly include women in the language of the Iowa Constitution's inalienable rights clause. *See* Iowa Const. amend. 45.

Of course, women now play a far greater role in shaping society than they did in the middle of the nineteenth century. The political actors responsible for the statute at issue—Iowa Code section 146E.2 (2023)—include significant female representation in leadership roles in both the general assembly and the governor's office, along with a female attorney general whose office is tasked with defending the statute. The overwhelming majority of these women have spent

---

[1] *See, e.g.*, *Zerfing v. Mourer*, 2 Greene 520, 521–22 (Iowa 1850) (affirming the defendant's liability in a trespass action for seducing and impregnating the plaintiff's daughter); Iowa State Univ., *Women's Suffrage in Iowa* [hereinafter *Women's Suffrage in Iowa*], https://cattcenter.iastate.edu/timeline/ [https://perma.cc/B3WB-WAJR]; *see also Bradwell v. Illinois*, 83 U.S. 130, 141 (1872) (Bradley, J., concurring) ("[T]he civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman. . . . So firmly fixed was this sentiment in the founders of the common law that it became a maxim of the system of jurisprudence that a woman had no legal existence separate from her husband, who was regarded as her head and representative in the social state . . . .").

[2] *See Women's Suffrage in Iowa.*

[3] *See* Nat'l Women's Hist. Museum, *Timeline: Woman Suffrage Timeline* (Apr. 12, 2018), https://www.womenshistory.org/exhibits/timeline-woman-suffrage [https://perma.cc/H9L7-GPEN].

most—if not all—of their lives with the ability to choose whether to continue a pregnancy under the United States Supreme Court's 1973 decision in *Roe v. Wade*, 410 U.S. 113, 153 (1973). And as a female serving as the chief executive officer of the state's judicial branch and only the third woman appointed to the Iowa Supreme Court, I know all too well how far women have come and the efforts it took to achieve this progress. But we didn't come this far to say, "Our work is done."

Unfortunately, this statute—and the majority's decision allowing it to take effect—not only brings that progress to a halt but also takes a giant step backward. Despite the great strides men and women have made for women's equality in the decades since the drafting of our state constitution, women "are once again relegated to their traditional (and outdated) roles as only child-bearers and mothers," "forced to live their twenty-first century lives by nineteenth century standards and mores." *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1235 (Idaho 2023) (Stegner, J., dissenting). This law is contrary to the rights afforded under the Iowa Constitution. Accordingly, I dissent from the majority's decision and would affirm the district court's temporary injunction, finding what's referred to as "the fetal heartbeat bill" unconstitutional. In doing so, I also join Justice Mansfield's dissent in full, including his constitutional analysis.

**I. Women Have the Right to Decide Whether to Continue Their Pregnancy.**

In 2018, our court held that the decision to end a pregnancy is implicit in the concept of ordered liberty and thus a fundamental right under the due process clause of the Iowa Constitution. *Planned Parenthood of the Heartland v. Reynolds ex rel. State* (*PPH 2018*), 915 N.W.2d 206, 237–38 (Iowa 2018). Accordingly, any regulations affecting this right were subject to strict scrutiny. *Id.* at 238. Four years later, and with a significant change in the makeup of our court, we overruled that 2018 decision with a majority of the court concluding "that the

Iowa Constitution is not the source of a fundamental right to an abortion necessitating a strict scrutiny standard of review for regulations affecting that right." *PPH 2022*, 975 N.W.2d at 716.

At the time, I declined to weigh in on the merits of that debate on stare decisis grounds. *See id.* at 750–56 (Christensen, C.J., concurring in part and dissenting in part). I concluded that no special justification "warrant[ed] such a swift departure from the court's 2018 decision," so I would have applied strict scrutiny review to analyze the twenty-four-hour waiting period at issue in line with our 2018 holding. *Id.* at 750. Putting aside whether stare decisis should have constrained our court from overturning that 2018 decision, I acknowledge that the 2018 decision is no longer controlling precedent. But part of the reason this case is before us is that no majority of the court agreed on the appropriate standard of review to apply to abortion regulations in our 2022 decision. *Id.* at 744–45 (majority opinion).

This time around, even Planned Parenthood has abandoned its call for strict scrutiny review, arguing instead that "[a]n intermediate level of scrutiny is appropriate in the abortion context because of the importance of balancing the different interests at stake." Meanwhile, the State advocates for rational basis review of abortion regulations. Therefore, I see no reason to re-litigate our 2018 and 2022 decisions to consider whether abortion regulations are subject to strict scrutiny because neither party is asking for that. *Id.* at 745 ("[W]e should not go where the parties do not ask us to go.").

I join Justice Mansfield's dissent and agree that—at the very least—we should "evaluate state regulations and restrictions on abortions before the sixteenth week using intermediate scrutiny and the *Casey* undue burden standard." It is painfully apparent to me that the majority misapprehends the nature

of the liberty at issue here. It is not whether abortion, with the polarizing reactions it evokes, is a fundamental right but rather whether individuals have the fundamental right to make medical decisions affecting their health and bodily integrity in partnership with their healthcare provider free from government interference. I also write separately to highlight some of my qualms with the majority opinion and the impractical exceptions to the statute that are likely to generate new constitutional challenges.

**A. Iowa's History and Tradition Surrounding Abortion is Not Clear-Cut.** By exclusively relying on the text of our constitution that was adopted in 1857 and our state's history and tradition to conclude that abortion is not a fundamental right, the majority perpetuates the gendered hierarchies of old when women were second-class citizens. Justice Mansfield's dissent accurately details the oppression that women in Iowa faced for much of our history, while the majority glosses over this part of our state's history and tradition. With a full account of our early treatment of women in Iowa and their utter absence in decision-making roles, it is not surprising that Iowa lacks a rich history and tradition of supporting abortion. The majority's approach provides no opportunity to overcome or repudiate this history.

Nonetheless, the majority oversimplifies Iowa's history and tradition regarding abortion by concluding that it provides *no* support for abortion as a fundamental right under the state constitution. Despite Iowa's history of laws criminalizing or restricting abortion, women in Iowa have long had the ability to terminate a pregnancy to preserve the life of the mother. This dates back to Iowa's time as a territory, when the 1843 territorial law banned the "administ[ration] to any woman, pregnant with a child, any medicine, drug, or substance whatever, or shall employ any other means with intent thereby to destroy such child, and thereby cause its death, *unless the same shall be necessary to preserve the life*

*of the mother.*" Iowa Rev. Stat. ch. 49, § 10 (Terr. 1843) (emphasis added.) And, consistent with the treatment of women at the time, the motivation for criminalizing abortion was rooted in sexism, as "[t]he leading advocate of criminalization, Dr. Horatio Storer and his colleagues, vigorously resisted the entry of women into the medical profession." *PPH 2022*, 975 N.W.2d at 796 (Appel, J., dissenting). Yet, a woman in Iowa had at least a limited ability to end her pregnancy even at a time when she "had little or no say about her body and her children, her property, where she lived, her civic duties, her opportunities, her career, her dress—indeed her life." *Okla. Call for Reprod. Just. v. Drummond*, 526 P.3d 1123, 1135 (Okla. 2023) (per curiam) (Kauger, J., concurring).

For decades, Iowa continued to make an exception to its abortion laws for the life of the mother. *See* Iowa Code § 701.1 (1966) (criminalizing "any person, with intent to produce the miscarriage of any woman, willfully administer to her any drug or substance whatever, or, with such intent, use any instrument or other means whatever, *unless such miscarriage shall be necessary to save her life*" (emphasis added)). We also gave physicians deference in determining whether an abortion was necessary under the exception, holding that a physician who performs the procedure "is entitled to the presumption of correct judgment and good faith, thereby falling under the therapeutic exception." *State v. Abodeely*, 179 N.W.2d 347, 354 (Iowa 1970).

As I will explain later, the statute at issue today does not give physicians this same professional latitude in their decision-making. Nor does it give many pregnant women any meaningful opportunity to terminate a pregnancy when it threatens their health or ability to carry a child to term in the future. In short, although the right was limited, Iowa's history and traditions certainly, at a minimum, support a woman's right to obtain an abortion to save her life. The majority ignores this aspect of our history altogether.

Moreover, the majority's conclusion too heavily weighs the absence of any text in our state constitution referring to, or including, abortion. Other procedures affecting bodily integrity and medical care that are not specifically mentioned in our constitution include organ transplants and blood transfusions. Like abortion, some religions oppose or ban these medical practices, but it is difficult to imagine the State arguing "that an individual's right to make health-care decisions regarding [organ transplants or blood transfusions are] subject to a government ban because they are not specifically enumerated in our state constitution—or because some religions find them objectionable." *Planned Parenthood S. Atl. v. State,* 882 S.E.2d 770, 804 (S.C. 2023) (Beatty, C.J., concurring).

On a related note, some may find this abortion ban objectionable on religious grounds. Those include Iowans of Jewish faith, who may have a sincerely held religious belief in their right to terminate a pregnancy after a fetal heartbeat is detected. The Court of Appeals of Indiana recently affirmed an injunction halting a similar abortion law under the state's Religious Freedom Restoration Act (RFRA) because the state failed to show "its claimed compelling interest in protecting the potential for life is satisfied by denying [Jewish] Plaintiffs' religious-based exception" given the statute's other exceptions for situations involving rape, incest, fetal abnormalities, and medical emergencies. *Individual Members of Med. Licensing Bd. of Ind. v. Anonymous Plaintiff 1*, 233 N.E.3d 416, 455 (Ind. Ct. App. 2024). Like Indiana's law, Iowa's newly enacted RFRA law triggers strict scrutiny and poses related legal issues. *See* 2024 Iowa Acts ch. 1003, § 4 (to be codified at Iowa Code § 675.2 (2025)).

Finally, the majority's decision raises concerns about the stability of other rights we consider fundamental. Our "precedents about bodily autonomy, sexual and familial relations, and procreation are all interwoven—all part of the fabric

of our constitutional law, and because that is so, of our lives." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 378 (2022) (Breyer, J., dissenting). Consequently, today's ruling casts doubt on the stability of rights like contraception, interracial marriage, and same-sex marriage should constitutional challenges to these rights come before us.

Same-sex marriage, for example, was historically forbidden in Iowa until our court held that a state statute limiting civil marriage to a union between a man and a woman violated the Iowa Constitution in 2009. *Varnum v. Brien*, 763 N.W.2d 862, 906–07 (Iowa 2009); *see also Obergefell v. Hodges*, 576 U.S. 644, 675 (2015) ("The Court now holds that same-sex couples may exercise the fundamental right to marry. No longer may this liberty be denied to them."). "[T]ime brings developments that our founders could not have contemplated . . . ." *Planned Parenthood Great Nw.*, 522 P.3d at 1215 (Zahn, J., dissenting). While I agree that we should look to Iowa's history and tradition to determine the framers' intent and guide our analysis, the rights of Iowans did not freeze once our state constitution took effect. Today's decision risks limiting our interpretation to conditions as they existed in the mid-19th century, eliminating rights from our constitution in the process.

**B. The Statute's Exceptions Authorizing Abortion in Certain Circumstances Are Unattainable for Many Pregnant Women and Girls.** While the statute outlines exceptions that allow for abortions in situations involving rape, incest, certain fetal abnormalities incompatible with life, miscarriages, or medical emergencies, they are crafted in such a way that the application rings hollow. *See* Iowa Code § 146E.2. Frankly, in many of these situations, they serve as another example of how this statute prioritizes the unborn over the living, placing pregnant women in grave harm in the process. Although the majority opinion rejects a facial challenge to the overall statute, it does not and could not close

the door to "as applied" challenges, including equal protection claims by individual women harmed as these problematic exceptions go into effect.

In discussing these exceptions, I recognize that the parties did not have the benefit of the Iowa Board of Medicine's (Board) rules on this statute during the briefing stage because the Board was still in the rulemaking process. Those rules have since been adopted, and while they illuminate some aspects of the exceptions, we are still left with many questions and concerns. One important yet unclear rule is the potential discipline a physician faces for performing an abortion on someone who does not qualify for one of these exceptions, as the rule simply states that failure to comply with the rules or statute "may constitute grounds for discipline." Iowa Admin. Code r. 653–13.17(5). But this is clear: the potential disciplinary options at the Board's disposal can be both career-ending and severe.[4]

It is important to keep in mind the State's proclaimed interests for this statute when reading the abortion exceptions. Primarily, the State contends the statute serves its "vital interest in protecting unborn human life at all stages of development." To a lesser degree, it also mentions the "protection of maternal health and safety," "elimination of particularly gruesome or barbaric medical procedures," "preservation of the integrity of the medical profession," "mitigation of fetal pain," and "preservation of discrimination on the basis of race, sex, or disability" as other legitimate interests in protecting life, both born and unborn. (Quoting *Dobbs*, 597 U.S. at 301.)

It takes little effort to understand how the statute's exceptions fail to further many of these proclaimed interests, regardless of whether we classify them

---

[4]The potential disciplinary options available to the Board include the revocation or suspension of a physician's medical license, a civil penalty up to $10,000, and even a criminal penalty that is a class "D" felony. *See* Iowa Code § 147.55; *id.* § 148.6.

as legitimate, important, or compelling. That is true even for the interest that the State stresses most—the "vital interest in protecting unborn human life at all stages of development"—because the statute includes exceptions to the abortion ban after the detection of a fetal heartbeat in certain situations when there is no threat to the pregnant woman or fetus. And in some instances, the statute's exceptions even have the potential to do more harm than good to the lives of the mother and unborn child.

*1. Rape and incest exceptions.* The statute attempts to provide exceptions that allow for abortion after the detection of a fetal heartbeat when women become pregnant as the result of either rape or incest. *See* Iowa Code § 146E.1(3). Suffering through rape or incest is certainly one of the most traumatic things a person can experience, particularly when it results in pregnancy.[5] But the State's "exceptions" for these survivors throw significant barriers in front of them by requiring actions that are unrealistic and unfair.

To terminate a pregnancy that was the result of rape, the rape must be "reported within forty-five days of the incident to a law enforcement agency or to a public or private health agency which may include a family physician" so long as the pregnancy has not reached a "postfertilization age" of "twenty or more weeks." *Id.* §§ 146E.1(3)(*a*), .2(2)(*b*). Further, the rules require a physician who intends to perform an abortion under the rape exception to use the following information in making a good-faith assessment that the exception applies:

> 1. The date the sex act that caused the pregnancy occurred.
>
> 2. The age of the woman seeking an abortion at the time of that sex act.

---

[5]This statute distinguishes rape from incest, but incest is generally a form of sexual abuse. We treat it as such under the criminal code, which classifies it as a class "D" felony. *See* Iowa Code § 726.2.

3. Whether the sex act constituted a rape.

4. Whether the rape was perpetrated against the woman seeking an abortion.

5. If initial reporting was to someone other than the physician who intends to perform or induce an abortion, the date the rape was reported to a law enforcement agency, public health agency, private health agency, or family physician.

Iowa Admin. Code r. 653–13.17(4)(*a*)(2). The physician may also "require the person providing the information to sign a certification form attesting that the information is true." *Id.* r. 653–13.17(4)(*a*)(2) (flush language). Nothing in the statute or rules declares who must make this report, so it is unclear if a credible secondhand report of rape from a pregnant nonverbal teenager's mother, for example, meets this reporting requirement when the patient either is too distraught or physically cannot report what happened to legal or medical authorities.

Notably, despite the statute's use of the term "rape" in the exception, it does not define that term. *See* Iowa Code § 146E.1(3)(*a*). "Rape" is not language used in our criminal code, which criminalizes "sexual abuse" instead. *See* Iowa Code § 709.1. According to the Board's rules, a "pregnancy is the result of a rape" when "the pregnancy is the result of conduct that would constitute an offense under Iowa Code section 709.2, 709.3, 709.4, or 709.4A when perpetrated against a female, regardless of where the conduct occurred." Iowa Admin. Code r. 653–13.17(2) (flush language).

These code sections include sexual abuse in the first degree, sexual abuse in the second degree, sexual abuse in the third degree, and sexual abuse in the fourth degree when a healthcare professional is the offender. *See* Iowa Code §§ 709.2–.4A. They all discuss ways in which a person commits varying degrees of sexual abuse, but none of them define "sexual abuse." That definition is in

Iowa Code section 709.1, so physicians will first have to know to read that portion of the Iowa Code before determining whether any rape occurred that meets the exception. *See id.* § 709.1. From there, the physician will have to become well-versed in the four different sexual abuse statutes encompassed in the rule to determine whether the pregnancy is the result of conduct that would constitute an offense under any of these four statutes. *See* Iowa Admin. Code r. 653–13.17(2) (flush language).

Physicians should not have to guess whether the patient's narrative legally constitutes "rape" before rendering medical treatment to the patient without fear of jeopardizing their medical license or career. The degree of sexual abuse is often baffling to law enforcement and prosecutors. How can we expect medical professionals to reach these legal conclusions when our own profession often struggles with making that same determination?

Likewise, the statute's exception for incest raises questions about how it applies. That exception allows for termination of a pregnancy that "is the result of incest which is reported within one hundred forty days of the incident to a law enforcement agency or to a public or private health agency which may include a family physician." Iowa Code § 146E.1(3)(*b*).[6] The 140-day reporting period amounts to twenty weeks. Under the rules,

> "The pregnancy is the result of incest" [when] a sex act occurs between closely related persons that involves a vaginal penetration that causes a pregnancy. The closely related persons must be related, either legitimately or illegitimately, as an ancestor, descendant, brother or sister of the whole or half blood, aunt, uncle, niece,

---

[6]Nothing in the statute or the Board's rules explains why a rape victim only has 45 days to report her rape while a victim of incest has 140 days to obtain an abortion under the exceptions. It makes no difference to the fetus whether the report is made in 45 days or 100 days, but our legislature saw fit to let a pregnancy conceived through incest progress further along than a pregnancy conceived through rape before allowing for its abortion.

or nephew. For purposes of this rule, a closely related person includes a stepparent, stepchild, or stepsibling, including siblings through adoption.[7]

Iowa Admin. Code r. 653–13.17(2) (flush language) (italicization omitted).

Like the rape exception, it is unclear who is qualified to report this for the exception to apply, which is concerning because incest often involves child victims. Once a report is made, the physician intending to perform the abortion must obtain similar information to that required for the rape exception. *Id.* r. 653–13.17(4)(*a*)(1). The rules do not prescribe how a physician is to obtain the information required to determine whether the rape or incest exception applies, though the rape exception states that the physician "may rely on the information received upon a good-faith assessment that the information is true." *Id.* r. 653–13.17(4)(*a*)(2) (flush language). This offers little reassurance when discipline for failing to comply with the rules or the statutory requirements can destroy a physician's medical career.

In reality, if Iowa follows the trend of other states with similar bans, there will likely be few physicians trained and willing to perform abortions in the state, even if a physician determines that one of the exceptions applies.[8] Statistics from the Association of American Medical Colleges (AAMC) show that "for the second year in a row, students graduating from U.S. medical schools this year were less likely to apply for residency positions in states with abortion bans and other

---

[7]The Board's rule regarding incest lists aunts and uncles who are closely related, but that appears to exclude aunts, uncles, or other relatives by marriage who are not biologically related to the victim.

[8]*See, e.g.*, Julie Rovner & Rachana Pradhan, *Medical Residents are Starting to Avoid States with Abortion Bans, Data Shows*, NPR (May 9, 2024, 8:01 AM) [hereinafter *Medical Residents are Starting to Avoid States with Abortion Bans*], https://www.npr.org/sections/health-shots/2024/05/09/1250057657/medical-residents-starting-avoid-states-abortion-bans [https://perma.cc/YNK6-QSUC].

significant abortion restrictions."[9] With this statute in place, Iowa certainly falls within that category of states that ob-gyns will avoid. The AAMC analysis also reveals "that the number of applicants to OB-GYN residency programs in abortion-ban states dropped by 6.7%, compared with a 0.4% increase in states where abortion remains legal."[10]

Recent medical school graduates are not alone in their decision to avoid states with strict abortion laws. An August 2022 survey of 1,000 jobseekers in the United States revealed that one in three jobseekers would not apply to jobs in states with abortion bans.[11] More recently, fifty-one businesses in Texas submitted an amicus brief to the Texas Supreme Court in support of Texas women challenging the state's abortion ban, detailing how the ban is "increasing the cost of business in Texas, driving away top talent, risking potential future business coming to the State, and threatening a diverse workforce."[12] They cited research estimating Texas's abortion restrictions could cause an economic loss to women and the state economy of $14.5 billion annually due to a reduction in labor force participation, earning level, and increasing turnover and time off from work among women ages fifteen to forty-four years.[13] This information does not bode well for Iowa, considering 34% more of our state's college-educated workforce

---

[9]*Medical Residents are Starting to Avoid States with Abortion Bans.*

[10]*Medical Residents are Starting to Avoid States with Abortion Bans.*

[11]Jennifer Liu, *Turning Down a $300K Job, Deferring Dreams of Austin: How* Roe*'s End is Changing Millenials' Career Plans—and Lives,* CNBC (Aug. 18, 2022, 10:04 AM), https://www.cnbc.com/2022/08/18/how-roes-end-is-changing-millennials-career-plans-and-lives.html [https://perma.cc/5FRX-EHDB].

[12]Brief for Amici Curiae Bumble Inc. and Other Businesses and Businesspeople in Support of Appellees, 2023 WL 8355790, at *1 (filed Nov. 20, 2023), *State v. Zurawski,* No. 23–0629, 2024 WL 2787913 (Tex. May 31, 2024), [Brief for Bumble Inc. et al.].

[13]Brief for Bumble Inc. et al.; *see also* Erin Weber, *Texas Abortion Ban and Other Restrictions Cost the State Economy Almost $15 Billion Per Year,* Inst. for Women's Pol'y Rsch. (Sept. 2, 2021), https://iwpr.org/texas-abortion-ban-and-other-restrictions-cost-the-state-economy-almost-15-billion-per-year/ [https://perma.cc/X86H-Q35B].

leaves the state after graduation than stays here, making us the tenth worst state at retaining new college graduates according to a 2022 report.[14]

Perhaps these concerns overshadow an even bigger problem with the rape and incest exceptions, which is that most sexual assaults go unreported. The Bureau of Justice Statistics found that only 21.5% of rape or sexual assaults were reported to police in 2021 and 21.4% in 2022. Alexandra Thompson & Susannah N. Tapp, U.S. Dep't of Just., *Criminal Victimization, 2022* 6 tbl.4 (2023), https://bjs.ojp.gov/document/cv22.pdf [https://perma.cc/467K-MCYT]. When victims do report, it is often delayed because the process of reporting "involves many things that a victim's [posttraumatic stress disorder] would push them to avoid, including thinking about the assault [and] detailing the assault." Jillian Miller Purdue & Fredrick E. Vars, *Time to Heal: Trauma's Impact on Rape & Sexual Assault Statutes of Limitations*, 11 Tex. A&M L. Rev. 125, 139 (2023).

Plus, those seeking incest exceptions face additional obstacles, as they are often minors whose abusers are family members.[15] They risk being kicked out of their home and ostracized by their family, who may very well support the abuser. As I have documented before, it is sadly "not uncommon to terminate the parental rights of parents who continue to deny their child's sexual abuse and continue to reside with the child's abuser." *In re D.D.*, 955 N.W.2d 186, 198–99 (Iowa 2021) (Christensen, C.J., concurring specially) (collecting cases involving this situation). Combine these risks with Iowa's requirement that minors obtain parental notification or judicial bypass to receive an abortion, and the already

---

[14]Erin Murphy, *Iowa's "Brain Drain" Among Worst in U.S., Analysis Shows*, The Gazette (Sept. 22, 2022, 6:38 PM), https://www.thegazette.com/state-government/iowas-brain-drain-among-worst-in-u-s-analysis-shows/ [https://perma.cc/F4S3-BLMR].

[15]*See, e.g.*, Elizabeth Chuck, *Post-*Roe, *Exceptions to State Abortion Bans Won't be Easy to Acquire*, NBC News (Jan. 24, 2022, 12:24 PM), https://www.nbcnews.com/news/us-news/post-roe-exceptions-state-abortion-bans-wont-easy-acquire-rcna34986 [https://perma.cc/6CPV-T495].

daunting task of reporting the incest to obtain an abortion under the exception becomes even more challenging. *See* Iowa Code § 135L.3.

This brings me back to my concerns about the reporting process required to obtain the exception. Imagine a twelve-year-old girl telling her mother that her stepfather raped her, resulting in pregnancy. As I have already noted, it is not uncommon for the mother to choose not to believe her own child or simply choose to stand by her man. How does a twelve-year-old navigate reporting this on her own? What twelve-year-old has the knowledge or wherewithal to independently report rape or incest to either law enforcement or medical professionals? What's worse is that the twelve-year-old may not even realize that she was the victim of a crime because she may live in a household where sexual abuse is sadly normalized. It is an understatement to say that this exception is unrealistic and unfair for many rape and incest survivors—especially the children among them—who become pregnant from these crimes.

When women (or young girls) are unable to clear those hurdles and are forced to carry their abuser's biological child to term, they encounter new battles. "The trauma of sexual assault lingers and can prevent victims from effectively continuing their employment, academic, or other life goals. It can therefore suppress economic success and increase the risk of impoverishment for victims of sexual assault." Jill C. Engle, *Sexual Violence, Intangible Harm, and the Promise of Transformative Remedies*, 79 Wash. & Lee L. Rev. 1045, 1071 (2022) (footnote omitted). This does not even address the additional trauma these survivors face when they are forced into custody battles or required to participate in litigation to terminate their abuser's parental rights to the child. *See, e.g.*, Jordan S. Miceli, Note, *The Haunting of Her House: How Virginia Law Punishes Women Who Become Mothers Through Rape*, 78 Wash. & Lee L. Rev. Online 129, 155–58

(Dec. 15, 2021) (discussing the harms women face when their rapists assert parental rights to the child conceived through rape); *see also* 2016 Iowa Acts ch. 1046, § 1 (codified at Iowa Code § 232.116(1)(*p*) (2017)) (authorizing termination of parental rights since 2016 when "[t]he court finds there is clear and convincing evidence that the child was conceived as the result of sexual abuse as defined in section 709.1, and the biological parent against whom the sexual abuse was perpetrated requests termination of the parental rights of the biological parent who perpetrated the sexual abuse").

Needless to say, these exceptions are fraught with problems. Most problematic for the State is that nothing in the record shows how it promotes its professed primary vital interest in protecting unborn life at all stages of development. These exceptions, while seemingly favoring the pregnant woman's interests over fetal life, are "based on a tragic circumstance rather than risks to the mother's physical health" or the desire to protect any fetal life. *Individual Members of Med. Licensing Bd. of Ind.*, 233 N.E.3d at 456. "It begs the question, why does the state abandon its professed primary [vital] interest, the protection of fetal life, in rape or incest cases?" *Planned Parenthood S. Atl.*, 882 S.E.2d at 800.

The State offers no reason why pregnancies that result from rape or incest can be terminated after a fetal heartbeat is detected while other pregnancies must continue. Terminating any of these pregnancies results in the loss of potential life, regardless of how those pregnancies were conceived. *See id.* The status of a woman in either situation is the same: she is pregnant.

*2. Medical emergency exception.* The statute's exception authorizing abortions when a pregnant woman is experiencing a medical emergency pits the life of the mother against the life of the fetus. In doing so, it treats the pregnant

woman as little more than a means to an end and ignores the mother's crucial role in carrying that potential life to term. That exception allows:

> [A]n abortion . . . to preserve the life of the pregnant woman whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy, *but not including psychological conditions, emotional conditions, familial conditions, or the woman's age; or when continuation of the pregnancy will create a serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman.*

Iowa Code § 146A.1(6)(*a*) (emphasis added); *see also id.* § 146E.1(4). It also authorizes abortions when a fetal heartbeat is detected after twenty or more weeks when "in the physician's reasonable medical judgment the pregnant woman has a condition which the physician deems a medical emergency" or an "abortion is necessary to preserve the life of an unborn child." *Id.* § 146E.2(2)(*b*). " 'Reasonable medical judgment' means a medical judgment made by a reasonably prudent physician who is knowledgeable about the case and the treatment possibilities with respect to the medical conditions involved." *Id.* § 146E.1(6) (italicization omitted). The Board's rules offer no additional insight into what constitutes a "medical emergency" under the exception.

Nationwide, this lack of guidance into what constitutes a life-endangering medical emergency in states with similar statutes continues to perplex physicians at the expense of the pregnant women seeking their care.[16] In Missouri, a United States Department of Health and Human Services investigation found the Freeman Health System in Joplin violated federal law when it refused to provide an abortion for a pregnant woman whose water broke early at seventeen weeks

---

[16] *See, e.g.*, Alice Miranda Ollstein & Megan Messerly, *Patients are Being Denied Emergency Abortions. Courts Can Only Do So Much*, Politico (April 23, 2024, 5:00 AM), https://www.politico.com/news/2024/04/23/doctors-abortion-medical-exemptions-00153317.

of pregnancy even though she was at risk for serious infection and doctors told her the fetus would not survive.[17]

In Oklahoma, a woman filed a federal complaint alleging the Oklahoma Children's Hospital turned her away when she was seeking an abortion due to life-threatening pregnancy complications because the ultrasound detected fetal cardiac activity.[18] The pregnant woman—who had a partial molar pregnancy[19] and was at risk of bleeding to death if the cysts inside her uterus ruptured—ultimately endured a three-hour trip across state lines to Kansas, where she was able to terminate her failed pregnancy.[20]

In ongoing litigation surrounding Idaho's abortion statute, board-certified ob-gyn Dr. Emily Corrigan gave specific examples of the problems she's experienced practicing at a Boise hospital under an ambiguous abortion statute that only protects abortions when they are necessary to prevent the mother's death. *See United States v. Idaho*, 623 F. Supp. 3d 1096, 1105 (D. Idaho 2022), *stay granted*, 83 F.4th 1130 (9th Cir. 2023), *rev'd*, 82 F.4th 1296 (9th Cir.) (mem.)

---

[17]Amanda Seitz, *Feds: Hospitals That Denied Emergency Abortion Broke the Law*, AP News (May 1, 2023, 5:52 PM), https://apnews.com/article/emergency-abortion-law-hospitals-kansas-missouri-emtala-2f993d2869fa801921d7e56e95787567 [https://perma.cc/W5UU-BH2H].

[18]Carmen Forman, *After Being Denied Life-Saving Abortion, Oklahoma Woman Files Hospital Complaint*, Oklahoma Voice (Sept. 13, 2023, 5:30 AM), https://oklahomavoice.com/2023/09/13/after-being-denied-life-saving-abortion-oklahoma-woman-files-hospital-complaint/ [https://perma.cc/A4YF-HZEH].

[19]In partial molar pregnancies, fertilization goes wrong, causing either two sperm to fertilize the same egg or an egg is fertilized by one sperm that later duplicates. Selena Simmons-Duffin, *"I'll Lose My Family" A Husband's Dread During an Abortion Ordeal in Oklahoma*, NPR (May 1, 2023, 10:44 AM) [*"I'll Lose My Family" A Husband's Dread During an Abortion Ordeal in Oklahoma.*], https://www.npr.org/sections/health-shots/2023/05/01/1172973274/oklahoma-abortion-ban-exception-life-of-mother-molar-pregnancy [https://perma.cc/DSE5-5YBW]. These pregnancies carry "a risk of heavy bleeding, infection, and a life-threatening condition called preeclampsia that can lead to organ failure. There's also a risk that cancer will develop." *Id.*

[20]*"I'll Lose My Family" A Husband's Dread During an Abortion Ordeal in Oklahoma.*

(en banc), *stay granted*, 144 S. Ct. 541 (2004), *rev'd sub nom. Moyle v. United States*, 2024 WL 3187605 (June 26, 2004) (per curiam).

Specifically, she discussed her treatment of "three recent patients—all of whom presented with emergency medical conditions and required an abortion." *Id.* The court summarized the concerns that Dr. Corrigan brought up with respect to these three patients:

> She says that for each of these patients, it was "medically impossible to say that death was the guaranteed outcome." Regarding Jane Doe 1, for example, she says that this patient "could have developed severe sepsis potentially resulting in catastrophic injuries such as septic emboli necessitating limb amputations or uncontrollable uterine hemorrhage ultimately requiring hysterectomy but [she] could still be alive." Jane Does 2 and 3 were in similar situations—they could have survived, but each "potentially would have had to live the remainder of their lives with significant disabilities and chronic medical conditions as a result of their pregnancy complication."

*Id.* (citations omitted); *see also Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 664 S.W.3d 633, 673–81 (Ky. 2023) (Keller, J., concurring in part and dissenting in part) (detailing numerous health risks women experience during pregnancy and how Kentucky's medical exception to its abortion statute takes healthcare decisions away from women and healthcare professionals).

Physicians in Iowa will now face the same sort of dilemmas at the expense of their patients as they try to discern whether an abortion is necessary to "preserve the life of the pregnant woman" as opposed to whether an abortion would prevent the woman from experiencing life-altering health complications. *Compare* Iowa Code § 146A.1(6)(*a*), *with id.* § 146E.1(4). That is *if* there are physicians trained and willing to perform abortions at all in Iowa. As I have already discussed above, data shows medical residents are starting to avoid even applying for positions in states with significant abortion bans.[21] And obstetricians who

---

[21] *See Medical Residents are Starting to Avoid States with Abortion Bans.*

already live in those states with strict abortion laws are discontinuing their practice, no longer providing abortions, or leaving the state.

In Idaho, for instance, more than fifty obstetricians stopped practicing in the state since its strict abortion ban took effect in August 2022, and only two obstetricians moved to the state to practice in a fifteen-month span.[22] Two hospitals closed their obstetric programs, and a third program was in "serious jeopardy" of closing.[23] Additionally, around 85% of obstetricians and gynecologists in the state practiced in its seven most populous counties, while only twenty-two of forty-four counties had access to any practicing obstetricians.[24]

This should be cause for concern in Iowa, where we already rank dead last with the fewest ob-gyns per capita of any state, and many pregnant women face long drives to receive the medical care they need.[25] "Since 2000, 31 Iowa counties—most of them rural—have closed their obstetric services. By 2020, just 46 of the state's 99 counties had at least one hospital that provided obstetric services, down from 77 counties in years prior."[26]

To be clear, this trend will affect all pregnant women in Iowa—not just those seeking an abortion. While Iowa continues to see a decline in obstetric facilities and providers, "the rate of obstetric complexities has risen, including a greater average maternal age; increased risks for obesity, diabetes, and high

---

[22]The Associated Press, *Dozens of Idaho Obstetricians Have Stopped Practicing There Since Abortions Were Banned, Study Says*, AP News (Feb. 21, 2024, 8:45 PM) [hereinafter *Dozens of Idaho Obstetricians Have Stopped Practicing*], https://apnews.com/article/idaho-abortion-ban-doctors-leaving-f34e901599f5eabed56ae96599c0e5c2 [https://perma.cc/7X58-ZXMV].

[23]*Dozens of Idaho Obstetricians Have Stopped Practicing.*

[24]*Dozens of Idaho Obstetricians Have Stopped Practicing.*

[25]*See* Novid Parsi, *Delivering Help to Address Iowa's Obstetric Care Needs*, Medicine Iowa (Spring 2024) [hereinafter *Delivering Help to Address Iowa's Obstetric Care Needs*], https://medicineiowa.org/spring-2024/delivering-help-address-iowas-obstetric-care-needs [https://perma.cc/3KH2-SJRH].

[26]*Delivering Help to Address Iowa's Obstetric Care Needs.*

blood pressure among mothers; increased pre-delivery hospital stays; more premature births; and more babies requiring neonatal intensive care units."[27] Plus, "[t]he farther that pregnant women must travel for care, the greater the risks of morbidity for the mother or the infant."[28]

"Preserving the life or health of the woman necessarily includes providing an abortion when necessary to prevent severe, life altering damage." *Wrigley v. Romanick*, 988 N.W.2d 231, 242–43 (N.D. 2023). Iowa's medical emergency exception fails on this front because its definition of "[m]edical emergency" explicitly states that it does not include situations "when continuation of the pregnancy will create a serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman." Iowa Code § 146A.1(6)(*a*). Does that mean there is no exception even in cases where a woman will be forced to endure a hysterectomy because she could not obtain a timely abortion under this law? See *Idaho*, 623 F. Supp. 3d at 1105 (discussing medical complications during pregnancy that could result in a hysterectomy if not treated swiftly through abortion).

It also specifically excludes "psychological conditions [or] emotional conditions." Iowa Code § 146A.1(6)(*a*). Accordingly, "[i]f the pregnant woman has a serious mental health condition, such as bipolar disorder or schizophrenia, and takes medications which are contraindicated for pregnancy," she must "either take those medications and deal with the impacts the medication will have on the unborn or stop taking potentially life-saving medications and hope for the best." *Planned Parenthood Great Nw.*, 522 P.3d at 1225. This example is part of a bigger picture in which nearly 23% of pregnancy-related deaths are attributed

---

[27] *Delivering Help to Address Iowa's Obstetric Care Needs.*

[28] *Delivering Help to Address Iowa's Obstetric Care Needs.*

to mental health conditions that include suicide and overdose or poisoning related to substance use disorder, according to the Centers for Disease Control and Prevention.[29]

Other life-altering consequences that may not qualify under the "medical emergency" definition because they are not life-endangering include "severe sepsis requiring limb amputation, uncontrollable uterine hemorrhage requiring hysterectomy, kidney failure requiring lifelong dialysis, [and] hypoxic brain injury," potentially requiring these women to live the rest of their lives "with significant disabilities and chronic medical conditions as a result of [their] pregnancy complication[s]." *Wrigley*, 988 N.W.2d at 243 (quoting *Idaho*, 623 F. Supp. 3d at 1101); *see also Allegheny Reprod. Health Ctr.*, 309 A.3d at 823 (acknowledging information from providers that "continuing a pregnancy can exacerbate [pre-existing] conditions and pose serious threats to a woman's long-term health" and that "[t]he 'health damage, though serious and potentially life-threatening, is usually not imminent enough to qualify the patient for abortion coverage under the statutory exception to the [Medicaid] coverage ban, which requires that the abortion be necessary to "avert the death" of the woman, rather than to avoid serious long-term health consequences' ").

And though it should be obvious, the construction of this exception contradicts the State's claim that one of its interests in protecting life—both born and unborn—is the "protection of maternal health and safety." "A state interest that truly was concerned with protecting women's health would contain an exception . . . for the health of the woman even when she does not face death . . . ." *Allegheny Reprod. Health Ctr.*, 309 A.3d at 957 (Wecht, J., concurring). Sadly,

---

[29]Ctrs. for Disease Control & Prevention, *Four in 5 Pregnancy-Related Deaths in the U.S. are Preventable*, CDC Newsroom (Sept. 19, 2022), https://www.cdc.gov/media/releases/2022/p0919-pregnancy-related-deaths.html [https://perma.cc/JL2P-27EX].

that is not the case here, and this lack of regard for the lives of pregnant women overlooks the impact that pregnancy complications can have on the family unit. *See Planned Parenthood Great Nw.*, 522 P.3d at 1220.

In particular, "[t]he health risks and complications a woman faces during pregnancy can leave her unable to care for her existing children throughout the pregnancy." *Id.* "Even after childbirth, it can take months or years for a woman to fully recover—*if* she completely recovers." *Id.* Worse, when pregnancy complications result in the mother's death, the life of the fetus that the statute is aiming to protect—if it survives birth—and any of the woman's remaining children are left without a mother. *Id.* "A mother cannot care for, teach, and otherwise rear her children if pregnancy complications claim her life or lead to serious health consequences . . . [,] creating a domino effect where she can no longer provide care to those who need her most." *Id.* Nevertheless, this statute treats her life as an afterthought.

In virtually any other medical setting, a competent nonpregnant person experiencing medical complications may collaborate with their physician to make an informed decision about their course of treatment. *See Okla. Call for Reprod. Just.*, 526 P.3d at 1131 ("We know of no other law that requires one to wait until there is an actual medical emergency in order to receive treatment when the harmful condition is known or probable to occur in the future."). But when pregnant women experience life-threatening complications that could require an abortion, the statute's exception "put[s] *all medical decisions and the power to pursue the pregnant patient's safety* solely in the hands of the physician; the patient will play no part" unless she has the ability to travel to a state that will terminate the pregnancy. *Cameron*, 664 S.W.3d at 676 (Keller, J., concurring in part and dissenting in part). It does so "not based upon science or viability but

upon a blanket assertion that [our State is] the protector[] of 'life' from the moment of conception." *Individual Members of Med. Licensing Bd. of Ind.*, 233 N.E.3d at 461 (Bailey, J., concurring).[30]

*3. Fetal abnormalities incompatible with life.* Like the statute's medical emergency exception, the exception authorizing abortions when the fetus has a fetal abnormality incompatible with life is largely unusable because, as discussed below, parents will often learn this devastating news when the fetal abnormality exception is no longer an option for them. Greer Donley, *Parental Autonomy Over Prenatal End-of-Life Decisions*, 105 Minn. L. Rev. 175, 218–19 (2020) [hereinafter Donley]. This exception authorizes an abortion if "[t]he attending physician certifies that the fetus has a fetal abnormality that in the physician's reasonable medical judgment is incompatible with life." Iowa Code § 146E.1(3)(*d*). The Board's rules require that certification contain the "diagnosis of the abnormality"; "basis for the diagnosis, including the tests and procedures performed, the results of those tests and procedures, and why those results support the diagnosis"; and "[a] description of why the abnormality is incompatible with life." Iowa Admin. Code r. 653–13.17(4)(*b*). "The diagnosis and the attending physician's conclusion must be reached in good faith following a bona fide effort, consistent with standard medical practice and reasonable medical judgment, to determine the health of the fetus." *Id.* r. 653–13.17(4)(*b*) (flush language).

---

[30]It is concerning that our legislators are attempting to dictate how medical professionals perform their job, such as requiring the use of an abdominal ultrasound in testing for a fetal heartbeat when a transvaginal ultrasound is the preferred practice in the first trimester because it can provide more detailed results. *See* Venkatesh A. Murugan et al., *Role of Ultrasound in the Evaluation of First-Trimester Pregnancies in the Acute Setting*, Ultrasonography (Oct. 16, 2019) https://www.e-ultrasonography.org/journal/view.php?doi=10.14366/usg.19043 [https://perma.cc/2DM2-Y5GC]; NHS Found. Tr., Cambridge Univ. Hosps., *Transvaginal Ultrasound Scan (TVS) in Early Pregnancy*, https://www.cuh.nhs.uk/patient-information/transvaginal-ultrasound-scan-tvs-in-early-pregnancy/ [https://perma.cc/96MJ-2JW5].

This exception is not available once the fetus reaches twenty or more weeks if there is a detectable fetal heartbeat unless the pregnant woman has a medical emergency that threatens her life "or the abortion is necessary to preserve the life of an unborn child." Iowa Code § 146E.2(2)(*b*). Yet, "parents most commonly receive a fetal diagnosis of an anatomical condition during the anatomy ultrasound, which occurs roughly halfway through the pregnancy (around twenty weeks)," and "[m]ost anatomical conditions cannot be diagnosed sooner than this mid-pregnancy ultrasound because the organs are not sufficiently developed before this point." Donley, 105 Minn. L. Rev. at 218–19.

Even if a fetal abnormality is discovered before the twenty-week deadline to the exception, it may take weeks for the pregnant woman to undergo additional tests or receive a second opinion to feel confident in the diagnosis and understand the fetus's prognosis. *Id.* at 219. While time is of the essence under the fetal abnormality exception, it can also take a pregnant woman weeks to obtain an appointment to terminate her doomed pregnancy, comply with the state-mandated waiting period, and collect the funds necessary to pay for the procedure. *Id.* at 219–20. Thus, the statute's twenty-week ban will either prevent pregnant women from ending their pregnancy that is incompatible with life, "rush an incredibly fraught decision, or force them to travel out of state, adding additional stress, cost, and trauma." *Id.* at 220.

Finding out that a baby so desperately wanted will not survive birth is certainly heartbreaking. The twenty-week limit on the fetal abnormality exception has the callous potential to make an incredibly difficult situation even worse by forcing pregnant women to carry their doomed pregnancies to term with the pain of knowing their fetus will not survive.

This is already happening in other states with comparable exceptions. In South Carolina, a pregnant woman was forced to carry her nonviable fetus for

seven weeks after learning at the fetus's eighteen-week scan that it had a rare congenital heart defect with "a very grim outlook" in even the best-case scenario.[31] Because it was too late to end the pregnancy under South Carolina law, she had to travel to another state to obtain the procedure.[32]

In Alabama, where the state's strict abortion ban made exceptions for conditions in which the fetus would be stillborn or die shortly after birth, doctors denied a patient the option to terminate her pregnancy even though her fetus had a severe genetic abnormality that doctors said would result in either a stillbirth or death immediately after birth.[33] She had to seek financial help and then make a daylong drive with her husband to Washington D.C. for the procedure.[34] The woman opted for sterilization shortly thereafter, explaining, "The experience, going through everything with finding out that your child is not going to live … it inflicted so much trauma on me . . . . I don't ever want to go through that again and I wouldn't wish this upon my worst enemy."[35]

In Florida, it was too late to terminate a pregnancy under the state's abortion ban when doctors informed a pregnant woman at her fetus's twenty-four-week ultrasound that the fetus had no kidneys and was sure to die.[36] Unable to

---

[31]Stephanie Emma Pfeffer, *Former Ms. South Carolina Forced to Carry Unviable Fetus for 7 Weeks: It "Was Like a Dagger to the Heart,"* People (Nov. 11, 2022, 1:04 PM) [hereinafter *Former Ms. South Carolina Forced to Carry Unviable Fetus for 7 Weeks: It "Was Like a Dagger to the Heart*], https://people.com/health/woman-forced-to-carry-unviable-fetus-for-7-weeks/ [https://perma.cc/B24S-QCX7].

[32]*Former Ms. South Carolina Forced to Carry Unviable Fetus for 7 Weeks: It "Was Like a Dagger to the Heart.*

[33]Nadine El-Bawab, Tess Scott, Christina Ng, & Acacia Nunes, *In Post-Roe America, Women Detail Agony of Being Forced to Carry Nonviable Pregnancies to Term*, ABC News (Dec. 14, 2023, 5:06 AM) [hereinafter *In Post-Roe America*], https://abcnews.go.com/US/post-roe-america-women-detail-agony-forced-carry/story?id=105563349 [https://perma.cc/4QDE-FKBM].

[34]*In Post-Roe America.*

[35]*In Post-Roe America.*

[36]Elizabeth Cohen, Carma Hassan, & Amanda Musa, *Because of Florida Abortion Laws, She Carried Her Baby to Term Knowing He Would Die*, CNN (May 3, 2023, 10:32 AM) [hereinafter

afford the costs of traveling out of state to terminate the pregnancy, the woman carried to term a baby who had no kidneys and died in her arms shortly after birth—just as her doctors had predicted would happen.[37] These stories are not unique.[38]

The agonizing experiences of these women not only highlight the lack of humanity inherent in Iowa's comparable statute but also demonstrate another problem with the State's claim that this statute relates to a "vital interest in protecting unborn human life at all stages of development." Namely, a statutory exception authorizing the abortion of a fetus diagnosed with a fetal abnormality that is incompatible with life before twenty weeks does nothing to protect unborn *life* at all stages of development. And if the reason for prohibiting the abortion of a fetus with a fetal abnormality incompatible with life after twenty weeks is that the fetus could survive by some miracle, then the exception authorizing abortions for these cases before the fetus reaches twenty weeks makes even less sense in the context of protecting unborn life.

Both situations involve fetuses with abnormalities incompatible with life, and nothing in the record demonstrates why a pregnant woman is only allowed to end this doomed pregnancy before twenty weeks. In any event, there is no unborn life to protect when a fetus has an abnormality *incompatible with life.*

---

*Because of Florida Abortion Laws, She Carried Her Baby to Term Knowing He Would Die*], https://www.cnn.com/2023/05/02/health/florida-abortion-term-pregnancy/index.html [https://perma.cc/L4MM-GUHN].

[37] *Because of Florida Abortion Laws, She Carried Her Baby to Term Knowing He Would Die.*

[38] *See, e.g.,* Nadine El-Bawab, Tess Scott, Christina Ng, & Acacia Nunes, *Delayed and Denied: Women Pushed to Death's Door for Abortion Care in Post-*Roe *America*, ABC News (Dec. 14, 2023, 5:09 AM), https://abcnews.go.com/US/delayed-denied-women-pushed-deaths-door-abortion-care/story?id=105563255 [https://perma.cc/2ZXP-VLJ8]; *Cameron*, 664 S.W.3d at 665 (Bisig, J., concurring in part and dissenting in part) (describing the stories of two Kentucky women whose healthcare providers informed them that they could not help the women terminate their nonviable pregnancies).

Instead of promoting life, the statute is promoting birth—even when that birth results in an already deceased baby.

*4. In vitro fertilization.* It would be cruelly ironic for a law purportedly enacted to save babies to actually result in fewer babies being born to families through in vitro fertilization (IVF). Yet, the statute's poorly crafted "twin exception" that ostensibly exists with IVF in mind raises serious questions about the operation of IVF programs at the University of Iowa and elsewhere that give hope to families desperately trying to have babies. Under that exception, a woman may obtain an abortion even when she is twenty or more weeks pregnant and the unborn child has a detectible fetal heartbeat if "the abortion is necessary to preserve the life of an unborn child." Iowa Code § 146E.2(*b*). An "unborn child" under the statute is "an individual organism of the species homo sapiens from fertilization to live birth." *Id.* § 146A.1(6)(*b*); *see also id.* § 146E.1(7). Can it be that the legislature is attempting to carve out an exception for voluntary abortions after twenty weeks for women who choose to become pregnant through IVF yet deny that same opportunity for women who have become pregnant through rape or incest?

This exception raises a host of potential issues for women in Iowa who resort to IVF to help them get pregnant. One issue is that the definition of "unborn child" is essentially the same as the definition that caught national attention in Alabama, where the Alabama Supreme Court held that the state's Wrongful Death of a Minor Act applied to all "unborn children," including embryos kept in a cryogenic nursery located outside of a biological uterus at the time of their destruction. *See LePage v. Ctr. for Reprod. Med., P.C.*, ___ So. 3d ___, ___, 2024 WL 656591, at *2, *6 (Ala. Feb. 16, 2024) (en banc) ("The upshot here is that the phrase 'minor child' means the same thing in the Wrongful Death of a Minor Act as it does in everyday parlance: 'an unborn or recently born' individual

member of the human species, from fertilization until the age of majority."). That definition, and the court's interpretation of it, raised questions for providers and patients alike, including whether patients had the autonomy to donate or destroy unused embryos and whether they could freeze future embryos that are created during fertility treatment.[39]

Iowa was not immune from this fallout, as Iowa's Senate Judiciary Committee declined to bring up a bill shortly thereafter that would increase the penalties for terminating a person's pregnancy without their consent, which also changed the phrase "terminates a human pregnancy" in the current law to "causes the death of an unborn person."[40] The committee chair stated that he pulled the bill over "definite concerns about in vitro fertilization and the negative effects and unintended consequences with that."[41] Similarly, the house judiciary committee chair indicated his belief that Iowa presented a different situation from Alabama but that "we have to come to terms with how we're going to deal with the IVF issue."[42] Opponents of the bill in the legislature also warned that it could jeopardize IVF treatment in Iowa.[43] However, laws that treat IVF clinics or

---

[39] *See, e.g.*, Kim Chandler, *Warnings of the Impact of Fertility Treatments in Alabama Rush in After Frozen Embryo Ruling*, AP News (Feb. 21, 2024), https://apnews.com/article/alabama-supreme-court-from-embryos-161390f0758b04a7638e2ddea20df7ca [https://perma.cc/XC4K-TCQS].

[40] Stephen Gruber-Miller, *IVF Fears Scuttle Iowa Bill Raising Penalty for Ending Pregnancy Without Consent*, Des Moines Reg. (Mar. 14, 2024) [hereinafter *IVF Fears Scuttle Iowa Bill Raising Penalty for Ending Pregnancy Without Consent*], https://www.desmoinesregister.com/story/news/politics/2024/03/14/key-lawmaker-brad-zaun-wont-advance-bill-with-penalties-for-killing-an-unborn-person-ivf-concerns/72961183007/ [https://perma.cc/9HJ9-XUK9].

[41] *IVF Fears Scuttle Iowa Bill Raising Penalty for Ending Pregnancy Without Consent*.

[42] *IVF Fears Scuttle Iowa Bill Raising Penalty for Ending Pregnancy Without Consent*.

[43] *IVF Fears Scuttle Iowa Bill Raising Penalty for Ending Pregnancy Without Consent*.

embryos created through IVF differently from other physicians or embryos created through natural reproduction—including rape or incest—raise other concerns, such as the denial of equal protection.

Another issue stems from the fertilization process itself. With IVF, eggs and sperm are removed from the female and male, and "fertilization happens outside the body," with the embryo "grown outside the body for a minimum of three to five days before being placed back into the body." Rebecca Feinberg, *Transcript: The Future of IVF Post Dobbs*, 37 J.L. & Health 35, 42 (2023) [hereinafter Feinberg]. And during this fertilization process, there is an increased number of embryos to increase the chance of achieving a live pregnancy. *Id.* at 46. Because multiple embryos are often transferred into a woman's uterus to achieve pregnancy, multiple pregnancies—i.e., twins or triplets—occur more often compared to natural reproduction. Judith Daar, *Where Does Life Begin? Discerning the Impact of* Dobbs *on Assisted Reproductive Technologies*, 51 J.L. Med. & Ethics 518, 521 (2023) ("In 2019, nearly 17% of all [assisted reproductive technology] births were multiples compared to just over 3% of all U.S. births.").

With more fetuses comes more risks for both the mother and the fetuses. *Id.* "When a pregnancy results in high order multiples, high-risk obstetricians typically recommend selective reduction" or abortion to terminate one or more of the fetuses and allow the pregnancy to progress more safely for both the remaining fetus or fetuses and the mother. Feinberg, 37 J.L. & Health at 50. Neither the statute nor the Board's rules provide guidance on how a physician is to make this determination that an "abortion is necessary to preserve the life of an unborn child." Iowa Code § 146E.2(*b*). Like the medical emergency exception, it is unclear how this exception applies in practice. And like the medical emergency exception, physicians will be left guessing and turning to lawyers for help making their medical decisions in addressing how to treat these high-risk pregnancies.

Finally, this exception allowing the termination of one unborn child to preserve the life of another when both unborn children have detectable fetal heartbeats calls into question the State's professed vital interest in protecting unborn life at all stages of development. Consider a mother in a fertility program trying for one baby who gets pregnant with quadruplets, all with detectable fetal heartbeats. According to her physicians, there is a nearly fifty percent chance that some or all of the babies will die or suffer catastrophic permanent disabilities if she tries to carry all four to birth. But if she aborts one of them, the odds of the other three being born healthy increases to eighty-five percent. Under the statute's vague exception allowing for an abortion to preserve the life of an unborn child, it is unclear—at best—how a physician should proceed. At worst, it means the mother could lose all four babies because the physician determines she does not meet the exception.

**II. Conclusion.**

In my opinion, the only female lives that this statute treats with any meaningful regard and dignity are the unborn lives of female fetuses. After that, this statute forces pregnant women (and young girls) to endure and suffer through life-altering health complications that range from severe sepsis requiring limb amputation to a hysterectomy so long as those women are not at death's door. All in the name of promoting unborn life—or, more accurately, birth. Nothing promotes life like a forced hysterectomy preventing a woman from ever becoming pregnant again because she could not terminate a doomed pregnancy under the medical emergency exception.

Those Iowans opposed to abortion with extremely limited exceptions may applaud today's decision because their interests align with the State's, and this ruling is a pivotal step in restricting the procedure in our state. Make no mistake: "[T]his discrete and momentary alignment is no protection against the state shifting its target. Empowering the state to direct and occupy the lives of individuals in ways that serve our personal interests also empowers the state to direct and occupy our lives in ways that do not." *Allegheny Reprod. Health Ctr.*, 309 A.3d at 970 (Wecht, J., concurring). Today's winners could very well be on the other side of the fence tomorrow. Although this fetal-heartbeat law most directly affects women, the ominous consequences of affirming this level of government intrusion will negatively impact all current and future Iowans in one way or another.

Waterman and Mansfield, JJ., join this dissent.

**MANSFIELD, Justice (dissenting).**

Six years ago, I dissented from a decision that subjected all abortion regulation in Iowa to strict scrutiny. *See Planned Parenthood of the Heartland v. Reynolds ex rel. State* (*PPH 2018*), 915 N.W.2d 206, 246–59 (Iowa 2018) (Mansfield, J., dissenting). I wrote, "The fact that there are *two* profound concerns—a woman's autonomy over her body and human life—has to drive any fair-minded constitutional analysis of the problem." *Id.* at 249. I remain of that view. But the court around me has shifted. So, instead of a constitutional rule that gives no weight to the State's interest in human life, we now have in Iowa a constitutional rule that gives no weight to a woman's autonomy over her body. *PPH 2018* "lack[ed a] sense of balance and perspective." *Id.* at 246. So, regrettably, does today's decision.

I believe that subjecting a near-total ban on abortion to a rational basis test—the same test we apply to traffic cameras, and a more forgiving test than the one we apply to a law not allowing county auditors to correct defective absentee ballot applications—disserves the people of Iowa and their constitution.[44] The liberty protected by article I, section 9 of the Iowa Constitution includes a woman's ability to make decisions regarding her own body, just as it includes rights of procreation, parenting, and to use contraception. Because Iowa Code section 146E.2 (2023) largely eliminates a woman's ability to end a pregnancy in our state, I would hold that it is unconstitutional and affirm the temporary injunction.

---

[44]*See Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 552–55 (Iowa 2019) (applying rational basis test to use of traffic cameras); *League of United Latin Am. Citizens of Iowa v. Pate*, 950 N.W.2d 204, 209–10 (Iowa 2020) (per curiam) (applying intermediate scrutiny to election law change).

I am convinced that the legislature and the Governor adopted chapter 146E out of the highest and best motives. They believe in the total sanctity of human life, including unborn life. But I fear that this is going to turn out badly. Chapter 146E will not end abortions for Iowans; it will only end most abortions in Iowa. When country after country around the world is legalizing abortion, it is incongruous for one of the freest states, in the freest country in the world, to be effectively outlawing it.[45]

Iowa recognizes a host of freedoms: the freedom to bring a loaded firearm into a government building, the freedom to ride a motorcycle without a helmet, the freedom to use cannabidiol for untested and unproven medical purposes, and the freedom to throw evidence of a crime into a trash can and not worry about the police retrieving it.[46] Everyone is free, except for the 600,000 Iowa women of childbearing age who will have no legal option in our state but to carry a pregnancy to term in most circumstances.

In part I of this dissent, I will discuss the practical consequences of lifting the injunction. In part II, I will respond to the majority's contention that in 2022, we held that abortion wasn't a fundamental right. In part III, I will explain why a woman's autonomy over her body is entitled to greater protection under our precedents than the rational basis test. In part IV, I will set forth the

---

[45]*See Abortion Law: Global Comparisons*, Council on Foreign Rels. (Mar. 7, 2024, 2:30 P.M.), https://www.cfr.org/article/abortion-law-global-comparisons [https://perma.cc/2QVX-7Q99] (noting that from 1994 to 2023 sixty countries increased access to abortion and four countries, including the United States, decreased access). With few exceptions, countries with democratically elected governments that respect the rule of law allow abortion to some extent. *See id.* (presenting a country-by-country map). In 2021, "[s]ixty-seven countries' laws permit[ted] abortion upon request with varied gestational limits, whereas 26 countries prohibit[ed] abortion altogether." Madison Glennie et al., *The World's Abortion Laws, in* Whose Choice is It?: Abortion, Medicine, and the Law 1, 1 (David F. Walbert & J. Douglas Butler eds., 7th ed. 2021) (footnote omitted).

[46]*See* Iowa Code § 724.28(3); *id.* § 124E.12(4)(*a*); *State v. Wright*, 961 N.W.2d 396, 420 (Iowa 2021).

constitutional standard that I believe applies to abortion regulation in Iowa. And in part V, I will explain why chapter 146E is unconstitutional under that standard.

**I. The Practical Consequences of Lifting the Injunction.**

Reasonable people can—and do—disagree strongly about abortion. It poses many difficult, wrenching questions. For an abortion opponent: Should a woman carrying twins be allowed to abort one fetus if the two are not doing well together, and this is the best chance of avoiding a bad outcome for both? For an abortion-rights advocate: Does a woman's autonomy over her body include the right to have an abortion for sex-selection purposes?

Regardless, Iowa Code chapter 146E clearly plants a flag at one end of this debate. By dissolving the temporary injunction and authorizing Iowa Code section 146E.2 to take effect, today's majority has eliminated a woman's ability to have an abortion as it has existed in Iowa since 1973.

It should be noted that the evidence in these proceedings has come from the plaintiffs. The plaintiffs filed affidavits; the State elected not to make any factual record.

The record shows that the statute essentially bans abortions six weeks after the last menstrual period or about two weeks after a woman with a regular menstrual cycle would have missed a period. But many women do not have regular menstrual cycles and would not realize they are pregnant at this time. Many ob-gyns will not schedule an initial appointment until well after the sixth week. If there is a serious but nonfatal fetal abnormality, there is no way to know this by the sixth week. In Iowa, over 90% of existing abortions occur after the sixth week.

Other issues exist. Asking for a medical appointment and obtaining one are two different things. Even men like me can attest to the delays one inevitably

experiences in trying to see a doctor or their assistant. Another complicating factor is that the clinics providing abortions in Iowa have the capacity to perform abortions, at most, three days a week.

Also, Iowa Code section 146A.1, not at issue here, requires at least a twenty-four-hour waiting period between the woman's first visit to the abortion provider and the actual abortion itself. Moreover, minors under the age of eighteen must go through a parental notification or a judicial bypass before undergoing an abortion, which takes additional time. *See* Iowa Code § 135L.3.

In whole, this means that a woman in Iowa has at most two weeks to determine she is pregnant, decide she does not want to carry the pregnancy to term, schedule and attend her initial visit with the medical provider that would perform the abortion, and schedule and attend the follow-up visit for the abortion itself at least twenty-four hours later. In short, Iowa Code chapter 146E preserves the theoretical, but not the practical, ability for a woman to have an abortion in Iowa.

**II. Our 2022 Decision Rejected Strict Scrutiny of Abortion Regulations; It Did Not Hold That There Was No Fundamental Right.**

My colleagues spend much of their majority opinion missing a point that was obvious to the district court in this case. That is, my colleagues contend that we previously held in 2022 that abortion is not a fundamental right under the Iowa Constitution. That's simply wrong, and repeating that assertion five times, as the majority does in the course of its opinion, doesn't make it any more true.

Our 2022 decision overruled our 2018 decision where we had gone beyond *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), to hold that abortion was a fundamental right requiring strict scrutiny of all abortion restrictions. *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State* (*PPH 2022*), 975 N.W.2d

710, 715 (Iowa 2022). The scope of our 2022 decision was clear: "[A]ll we hold today is that the Iowa Constitution is not the source of a fundamental right to an abortion necessitating a *strict scrutiny* standard of review for regulations affecting that right." *Id.* at 716 (emphasis added). As the district court put it in this case,

> The controlling opinion in *PPH 2022,* however, did not find that there was no fundamental right to an abortion protected under Iowa's Constitution. Rather, the Court only held that "the Iowa Constitution is not the source of a fundamental right to an abortion *necessitating a strict scrutiny standard of review for regulations affecting that right." PPH 2022*, 975 N.W.2d at 716 (emphasis added). That a distinction was intended is apparent from the Respondents' reasoning itself. If the court simply found that there was no fundamental right to an abortion, there would have been no reason to direct that undue burden remained the governing standard; the standard would have defaulted to the rational basis test under the same rationale as *Middlekauff* and *Horsfield.* That did not happen, prompting Justice McDermott's dissent . . . .

In 2022, we emphasized that a proper legal standard—unlike 2018's strict scrutiny—needed to account for the weighty considerations on *both* sides:

> We agree with the *PPH* [*2018*] majority that "[a]utonomy and dominion over one's body go to the very heart of what it means to be free." We also agree that "being a parent is a life-altering obligation that falls unevenly on women in our society." Yet, we must disapprove of *PPH [2018]'s* legal formulation that insufficiently recognizes that future human lives are at stake—and we must disagree with the views of today's dissent that the state has no legitimate interest in this area.

*Id.* at 746 (second alteration in original) (first quoting *PPH 2018*, 915 N.W.2d at 237; then quoting *id.* at 249 (Mansfield, J., dissenting)). Thus, *PPH 2022* overturned strict scrutiny but did not go further to hold that a woman lacked any kind of fundamental right.

There are fundamental rights that the state can regulate without triggering strict scrutiny. One example is voting. Voting is unquestionably a fundamental

right, but the state has a very significant interest in regulating voting, so we subject voting regulations to an intermediate standard of review. *See League of United Latin Am. Citizens of Iowa v. Pate* (*LULAC*), 950 N.W.2d 204, 209 (Iowa 2020) (per curiam) (applying the same "balancing approach" in another voting case); *id.* at 222–23 (Oxley, J., dissenting) (noting that voting is a fundamental right but also that voting regulations are subjected to a balancing approach); *Democratic Senatorial Campaign Comm. v. Pate*, 950 N.W.2d 1, 6–7 (Iowa 2020) (per curiam) (applying the *Anderson-Burdick* "balancing approach" to a state constitutional challenge to voting regulations)."

The majority makes an unsuccessful attempt to rebut the analogy. It contends that with voting, there are constitutional requirements on both sides and, with abortion, there are no constitutional requirements on either side. I disagree that there is no constitutional right of autonomy over one's own body. For example, we have noted that there is a widely recognized constitutional right to refuse medical treatment. *See Polk Cnty. Sheriff v. Iowa Dist. Ct.*, 594 N.W.2d 421, 426 (Iowa 1999) (en banc). In a particular case, this right is subject to a balancing test based on the state interests involved. *Id.* at 426–31.

**III. Iowa Recognizes a Constitutional Right for People to Make Personal Decisions Concerning Their Own Bodies, Procreation, and Parenting.**

Whatever may have been the scope of article I, section 9 in 1857, today it protects an individual's right to make personal decisions regarding procreation and parenting. This is not because any particular set of supreme court justices have imposed their policy preferences on Iowans but for many other logical reasons. Just as property law has not remained static since 1857, so too notions

of liberty have also evolved.[47] Today we value personal autonomy; some critics would argue that this has come at the expense of personal responsibility. Additionally, the 1857 Iowa constitutional framework that gave full protections only to white males has been supplanted by one that protects all citizens equally.

**A. Regardless of Original Intent, There Is Today a Substantive Due Process Right to Make Decisions Concerning Procreation, Parenting, and One's Own Body.** Our constitution proclaims that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. Originally "due process of law" may have meant simply "ordinary judicial proceedings in court," *Stewart v. Bd. of Supervisors*, 30 Iowa 9, 28 (1870), but it did not take long for the due process clause to assume substantive importance. For example, in *Wragg v. Griffin*, we held that it violated due process of law to force someone suspected of venereal disease to provide a blood sample for testing. 170 N.W. 400, 403 (Iowa 1919).

More recently, in *Santi v. Santi,* we struck down a statute authorizing our courts to order grandparent visitation over the objection of parents as violating substantive due process under article I, section 9. 633 N.W.2d 312, 321 (Iowa 2001). We concluded that the statute "exalts the socially desirable goal of grandparent-grandchild bonding over the constitutionally recognized right of parents to decide with whom their children will associate." *Id.* at 320. We said that since the statute permits "state intrusion on fit parents' fundamental liberty interest in childrearing, we find it facially unconstitutional under article I, sections 8 and 9 of the Iowa Constitution." *Id.* at 321.

In *In re Marriage of Witten*, a divorce case, we held that one party could not use the parties' previously frozen human embryos without the other's

---

[47]For example, at the time of the adoption of our constitution in 1857, it was illegal to hunt or fish on Sundays. *See* 1854 Iowa Acts ch. 33, § 1 (codified at Iowa Code § 4392 (1860)).

consent—even in the face of a prior agreement to the contrary. 672 N.W.2d 768, 782–83 (Iowa 2003). We stated, "We think judicial decisions and statutes in Iowa reflect respect for the right of individuals to make family and reproductive decisions based on their current views and values." *Id.* at 782. We added,

> [C]ourts that have considered one party's desire to use frozen embryos over the objection of the other progenitor have held that the objecting party's fundamental right not to procreate outweighs the other party's procreative rights, even in the face of a prior agreement allowing one party to use the embryos upon the parties' divorce.

*Id.* at 780.

In *Hensler v. City of Davenport,* we addressed a municipal ordinance that imposed fines and other sanctions on parents whose children repeatedly engaged in illegal activity and who failed to rebut a presumption of inadequate supervision. 790 N.W.2d 569, 575–76 (Iowa 2010). We recognized that a parent has a "fundamental parental right to exercise care, custody, and control over children" that warrants substantive due process protection. *Id.* at 581–82.

In *In re Guardianship of Kennedy,* we held that sterilization of an individual with intellectual disabilities without court approval would raise "serious due process concerns." 845 N.W.2d 707, 714–15 (Iowa 2014); *see also Varnum v. Brien,* 763 N.W.2d 862, 901 n.27 (Iowa 2009) ("The County does not specifically contend the goal of Iowa's marriage statute is to deter gay and lesbian couples from having children. Such a claim would raise serious due process concerns."); *State ex rel. Iowa Dep't of Health v. Van Wyk,* 320 N.W.2d 599, 606 (Iowa 1982) (en banc) ("As a matter of privacy persons enjoy a fundamental right to seek or reject medical treatment generally.").

In *McQuistion v. City of Clinton,* where a pregnant woman challenged a municipality's refusal to accommodate her pregnancy with a light-duty work assignment, we stated that the right to procreate qualifies as a fundamental right

for substantive due process purposes. 872 N.W.2d 817, 820–21, 833 (Iowa 2015).

In *State v. Fatland*, our court of appeals held that a condition prohibiting the defendant from becoming pregnant while on probation should be eliminated from the sentencing order because it "impinge[d] upon her fundamental right to procreation." 882 N.W.2d 123, 126 (Iowa Ct. App. 2016). The panel deciding this case included one of the members of today's majority. *Id.* at 124.

In light of the foregoing, I fail to see how a woman's right *not* to procreate can have no constitutional protection under the due process clause of article I, section 9. The decision not to have children is as fundamental as the decision to have children.[48]

The majority treats Iowa Code chapter 146E as a form of economic and social legislation. That is, it applies rational basis review because there are merely "interests" on both sides that can be balanced by the legislature so long as the legislature advances a reasonably conceivable interest. Yet if rational basis is the correct standard to apply to a law that requires a woman to carry a pregnancy to term, despite all the effects it has on her body and her future life, rational basis would also be the correct standard to apply to a law that does not allow her to do so. I reject both propositions.

This does not mean that any governmental interference is subject to strict scrutiny. Previously, we have considered the degree of intrusion. In *Hensler*, we applied only rational basis because "the ordinance does not intrude directly and substantially into a parent's parental decision-making authority, but instead only minimally impinges on a parent's fundamental right to direct the upbringing

---

[48]Could the Iowa Legislature limit family size, an issue that The Des Moines Register polled on in 1971? *See* James C. Mohr, *Iowa's Abortion Battles of the Late 1960s and Early 1970s: Long-term Perspectives and Short-term Analyses*, 50 Annals Iowa 63, 73 (1989). Today we would say clearly no.

of his or her child." 790 N.W.2d at 583. Likewise, in *McQuistion*, we rejected the constitutional challenge on the ground that "[r]easonable regulations that do not directly and substantially interfere with the right may be imposed." 872 N.W.2d at 833.

The majority analogizes a constitutional right of personal autonomy over one's body to a hypothetical right to possess and use illegal drugs. Not so. There is a world of difference between telling a woman she has to carry a pregnancy to term and telling someone they can't use meth. In the latter case, the state isn't interfering with decisions about procreation, sex, or parenting. It isn't forcing someone to donate their body to the burdens of pregnancy. It's simply putting a harmful outside agent off-limits because it leads to antisocial behavior. *See, e.g., State v. Hartog*, 440 N.W.2d 852, 855 (Iowa 1989) (drawing a distinction for constitutional purposes between "intimate decisions relating to marriage, procreation, child rearing, education or family that have heretofore been recognized as deserving of heightened constitutional protection" and the decision not to wear a seat belt (quoting *People v. Kohrig*, 498 N.E.2d 1158, 1161 (Ill. 1986) (per curiam))).

The better analogy, which the majority is surely aware of but doesn't address, is between laws restricting abortion and laws relating to contraception, sodomy, and same-sex marriage. If the rational basis test applies to the former, why not the latter? We held otherwise in *Varnum v. Brien*, 763 N.W.2d at 896–97. Should we have applied the rational basis test in *Varnum*?

**B. Constitutional Liberty, Especially for Women, Has Changed Since 1857.** Our state has changed dramatically since 1857 but particularly as to the status and rights of women. In 1998, the people of Iowa constitutionalized those changes to some extent by adopting the Iowa Equal Rights Amendment. *See* 1997 Iowa Acts ch. 216, § 1 (constitutionalized at Iowa Const. art. I, § 1) ("All

men *and women* are, by nature, free and equal, and have certain inalienable rights . . . ." (emphasis added)).

I begin by trying to paint a picture of 1857. That's difficult to do. But we can at least look at what was forbidden in the Iowa Code.

Although abortion wasn't illegal when our 1857 constitution took effect, six months later the general assembly adopted a law making the performance of an abortion a misdemeanor, "unless the same shall be necessary to preserve the life of such woman." 1858 Iowa Acts ch. 58, § 1 (codified at Iowa Code § 4221 (1860)). This is often cited as proving that article I, section 9—as originally understood—could not have prohibited laws against abortion.

The law applied to "every person who shall wilfully administer to any pregnant woman, any medicine, drug, substance or thing whatever, or shall use or employ any instrument or other means whatever, with the intent thereby to procure the miscarriage of any such woman." *Id.* A historian has explained that "the word 'pregnant' meant quickened," which occurred upon the "first perception of fetal movement by the mother herself." James C. Mohr, *Iowa's Abortion Battles of the Late 1960s and Early 1970s: Long-term Perspectives and Short-term Analyses*, 50 Annals Iowa at 63, 65 (1989). We might say today that this understanding avoids the word "pregnant" being superfluous to the word "miscarriage." *See Iowa Individual Health Benefit Reins. Ass'n v. State Univ. of Iowa*, 999 N.W.2d 656, 663 (Iowa 2023) ("We presume statutes or rules do not contain superfluous words." (quoting *State v. Boone*, 989 N.W.2d 645, 650 (Iowa 2023))).

Regardless, and perhaps more importantly, Iowa Code section 4221 was part of a larger legal fabric, a fabric that treated women in a protective yet patronizing way. When our constitution was adopted, a father could sue a man for seducing his daughter. *Zerfing v. Mourer*, 2 Greene 520, 520–21 (Iowa 1850).

An unmarried woman could sue a man for seducing her. *Gover v. Dill*, 3 Iowa (Clarke) 337, 339 (1856).[49]

Seducing "any unmarried woman of previously chaste character" was a felony that could be punished by up to five years in prison. Iowa Code § 2586 (1851); Iowa Code § 4209 (1860). Adultery was a felony that could be punished by up to three years in prison; if only one of the parties was married, they were still both guilty of adultery. Iowa Code § 2705 (1851); Iowa Code § 4347 (1860). Cohabitation was also a crime, although a misdemeanor. Iowa Code § 2709 (1851); Iowa Code § 4351 (1860).

---

[49]The Iowa Code of 1851 provided causes of action for seduction to an unmarried female and to the parent or guardian of a minor daughter. Iowa Code §§ 1696–1697 (1851). The Iowa Code of 1860 provided the same causes of action. Iowa Code §§ 2790–2791 (1860).

Defamation law also offers a window into 1850s Iowa. Consider *Dailey v. Reynolds*, 4 Greene 354 (Iowa 1854). There, we held that allegations that a woman "was guilty of fornication" were slanderous per se. *Id.* at 354, 356. In reaching this conclusion, we stated:

> A female against whom the want of chastity is established is at once driven beyond the reach of every courtesy and charity of life, and almost beyond the portals of humanity. By common consent, such an imputation is everywhere treated as the deepest insult and vilest charge that could be given or inflicted upon the victim or her friends . . . .

*Id.* at 355. We added that "society, as now constituted, shrinks from" the idea that such claims would not be slanderous per se "with a repugnance bordering upon horror" and that "[o]ur whole natures rise up in rebellion against such a revolting proposition." *Id.*

Significantly, only two years later we held that allegations that a woman had obtained an abortion were not slanderous per se. *Abrams v. Foshee*, 3 Iowa (Clarke) 274, 278–80 (1856). Our holding relied on the rule that to maintain a slander claim, the words must cause "some injury or loss to the plaintiff, either in *law* or *fact*," and under the 1851 Iowa Code, abortion was not illegal. *Id.* at 277–78.

We acknowledged *Dailey* was a "departure from the general rule" described above. *Id.* at 280. But, we reiterated that the words spoken there "would tend necessarily to exclude [the woman] from society, and render her infamous in the common sense of that term" and "would immediately and necessarily tend to hinder her advancement in life." *Id.* In our view, *Dailey* "ha[d] its origin, and receive[d] its sanction, in that just jealousy and care with which the reputation of the female for chastity, is guarded in every civilized community." *Id.*

So while a doctor could have gone to jail for performing an abortion, unless the man who impregnated the woman was her husband, there is a good chance that *he* would have committed at least one crime as well.

The second part of this picture is unthinkable today. We would view laws criminalizing cohabitation and adultery as worthy of the Taliban, and would almost certainly hold that they denied liberty without due process in violation of article I, section 9. So the original constitutional landscape must have changed since 1857.

We have to see that landscape as a whole. We can't ignore the morality code of mid-19th century Iowa as some sort of unconstitutional anachronism, while treating the abortion law of mid-19th century Iowa as some sort of constitutional guidepost for today.

Particularly that is true because in 1998, the citizens of Iowa voted by an overwhelming majority to broaden article I, section 1 to include women.[50] Thus, article 1, section 1 now provides, "All men *and women* are, by nature, free and equal, and have certain inalienable rights . . . ." Iowa Const. art. I, § 1 (emphasis added).

I adhere to my previously expressed view that article I, section 1 is not an independent source of constitutional rights. *See Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67, 93 (Iowa 2022) (Mansfield, J., concurring). It does not "add[] anything to the more specific constitutional guarantees elsewhere in the Iowa Bill of Rights." *Id.* "Article I, section 1 is essentially a paraphrase of some of the stirring language of our Declaration of Independence." *Id.* at 92. In that sense, it tells us what the principles of government should be rather than what the rules of a specific government are. I tend to agree with the views of a late 19th-century

---

[50] *See* Iowa Sec'y of State, *Iowa General Election - November 3, 1998: Official Canvass by County*, at 440, https://sos.iowa.gov/elections/pdf/10-8.pdf [https://perma.cc/BS8J-NL65].

treatise, "It may well be said that this section of the Constitution summarizes all the most sacred rights of the citizen, and that the declarations contained in the remainder of Article I are simply more specific or particular statements of the principles therein embodied." S.M. Weaver, Iowa: Its Constitution and Laws 43 (1897).

But that doesn't mean it lacks significance that in 1998 women were added to article I, section 1 by constitutional amendment. Our original constitution did not give women the same rights as men. For example, only white male citizens—later male citizens—had the right to vote under article II, section 1. Iowa Const. art. II, § 1 (1857). Only white males could serve in the general assembly. *See id.* art. III, § 4. The right to trial by jury as recognized in article I, section 9 was a right to a trial exclusively before "men." *Id.* art. I, § 9.

The 1998 amendment was clearly meant to erase all that. So in interpreting article I, section 9 regarding the rights of women, we should not be bound by the precise scope of the constitutional rights that were protected in 1857 when it was largely a man's constitution.

In 2014, I argued that when article II, section 5 of the Iowa Constitution was reenacted in amended form, this ratified the contemporaneous interpretation of that provision under which "infamous crime" meant a felony. *Chiodo v. Section 43.24 Panel*, 846 N.W.2d 845, 862 (Iowa 2014) (Mansfield, J., specially concurring). Or to put the matter less legalistically, "[T]here has been considerable water under the bridge since 1857." *Id.* at 861. This reset principle has been recognized in numerous other jurisdictions.[51] What happened in 1998

---

[51] *See McIntire v. State*, 83 N.E. 1005, 1006 (Ind. 1908) ("It has been held that, when a clause or provision of a Constitution or statute has been readopted after the same has been construed by the courts of such state, it will be concluded that it was adopted with the interpretation and construction which said courts had enunciated."); *Kuhn v. La. Highway Comm'n*, 142 So. 149, 150 (La. 1932) ("The presumption is that the Constitutional Convention of 1898, of 1913, and of 1931, in retaining in the Constitution of each of those years the

wasn't exactly a reset. Instead of updating a specific constitutional guarantee, the people of Iowa updated the general principles under which the specific guarantees should be read. Hence, when we interpret the specific guarantees of the Iowa Constitution, we must do so with attention to the rights of women as they have evolved from 1857 to 1998. Although much of *Democracy in America* rings true today, Tocqueville's observations about women may no longer apply:

> Thus Americans do not believe that man and woman have the duty or the right to do the same things, but they show the same esteem for the role of each of them, and they consider them as beings whose value is equal although their destiny differs.

substance of the language of article 156 of the Constitution of 1879, intended that it should have the same meaning that this court had given to it . . . ; otherwise the language would have been changed."); *Wakem v. Inhabitants of Van Buren,* 15 A.2d 873, 875 (Me. 1940) ("It is a general rule that a reenactment, in substantially the same language, of a constitutional provision which had been previously construed and explained by the court, carries with it the same meaning previously attributed by the court to the earlier provision, in the absence of anything to indicate that a different meaning was intended."); *Hitchcock v. State,* 131 A.2d 714, 719 (Md. 1957) ("Where a constitutional provision has received a judicial construction and then is incorporated into a new or revised constitution, it will be presumed to have been re-adopted with the knowledge of the previous construction and to have been intended to have the meaning given it by that construction."); *In re Sizer,* 254 S.W. 82, 84 (Mo. 1923) (en banc) ("The readoption of the constitutional provision now under consideration so many times with the interpretation placed upon it by this court, to say the least, is very persuasive evidence that the real meaning of the provision was just what this court has so long been holding that it meant."); *Bodie v. Pollock,* 195 N.W. 457, 458 (Neb. 1923) (per curiam) ("It is well settled in many, if not most, of the jurisdictions of the country that, where a construction of constitutional provisions has been adopted and a constitutional convention thereafter re-enacts such provisions, it re-enacts not only the language of the provisions but the construction which has attached to the same."); *Craig v. State,* 50 Tenn. 227, 230 (1871) ("The Convention which recently formed the new Constitution of this State, permitted the clause in the declaration of rights, to remain unaltered, with a full knowledge, as is to be presumed, of the decisions above mentioned, which, in our judgment, rests upon sound principle, and ought not to be disturbed."); *LeCroy v. Hanlon,* 713 S.W.2d 335, 340 (Tex. 1986) ("The people ratified the court's approach by passing an identical provision in the 1876 Constitution."); *see also Clark v. Ada Cnty. Bd. of Comm'rs,* 572 P.2d 501, 507 (Idaho 1977) (Lodge, Dist. J., specially concurring) ("That holding not only remains unchanged, it has been re-enforced by the fact that . . . the people of Idaho have amended Article 18, Section 6 of the Constitution several times, and each time have retained the elective position of county assessor."); *McLinko v. Dep't of State,* 279 A.3d 539, 592 n.20 (Pa. 2022) (Wecht, J., concurring) ("There can be no doubt that, where language is retained, its extant meaning and prior constructions are relevant to its present interpretation.").

Alexis de Tocqueville, *Democracy in America* v. 2, part III, ch. 12, 576 (Harvey C. Mansfield & Delba Winthrop eds. & trans., Univ. of Chi. Press 2000) (1840).

While originalism is an important tool in constitutional interpretation, it has its limits when considering a woman's rights relating to her body, sex, and procreation. Do originalists really believe that a woman has the same constitutional right of autonomy over her body today as in 1857? Really? Maybe Rosalind was referring to simplistic judicial originalism when she spoke of "lawyers in the vacation" who "sleep between term and term, and then they perceive not how time moves." William Shakespeare, *As You Like It* act 3, sc. 2, ll. 337–39.

The 1857 constitutional debates spanned thirty-nine days and 1,061 double-column pages. *See* 1–2 *The Debates of the Constitutional Convention of the State of Iowa* (W. Blair Lord, rep., 1857), https://publications.iowa.gov/7313/. Yet the word "woman" or "women" appears only sixteen times. *See id.* By comparison, the debates contain thirty-eight references to "horse" or "horses." *See id.* That Iowa no longer exists today.

**C. The Majority's Reliance Exclusively on the Democratic Process to Define the Scope of a Woman's Right of Autonomy Over Her Body is Unconvincing.** Apart from its mistaken reliance on the 2022 decision and the illegal drug analogy, the majority offers only a brief explanation for why a woman does not have a fundamental right of autonomy over her body. Essentially, it says that the state has a long history of laws against abortion and that "history supplies no support for abortion as a fundamental right." I disagree with the majority for several reasons.

First, we err if we define the fundamental right *only in terms of the restriction at issue*. We didn't say in *LULAC* that the fundamental right was

"absentee voting." *See LULAC*, 950 N.W.2d at 209. The right was voting, and the question was whether the legislation improperly entrenched on that right. *See id.* In *Meyer v. Nebraska,* a seminal substantive due process case, the United States Supreme Court didn't start by asking whether there was a fundamental right to be taught German in school. 262 U.S. 390, 399–400 (1923). Rather, the Court observed, that substantive due process

> denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*Id.* at 399. It then asked whether a state law that forbids teaching of modern foreign languages before the eighth grade wrongfully intruded on that general right and concluded that it did. *Id.* at 400–03; *see also Pierce v. Soc'y of Sisters*, 268 U.S. 510, 530, 534–35 (1925) (finding that a law requiring children to attend public schools "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control"). So too here, we need to ask whether a woman has a fundamental right of personal autonomy over her body as part of the "life" and "liberty" protected by article I, section 9. I think that answer is clearly yes. We then should ask whether a law practically banning abortion is an improper invasion of that right—notwithstanding the State's undeniable interest in promoting and preserving human life.[52]

---

[52] *Dobbs v. Jackson Women's Health Organization* says that abortion is "fundamentally different" from the other rights because an abortion ends a potential human life. 597 U.S. 215, 231 (2022). This observation tells me that there is *a powerful governmental interest* on the other side, but it doesn't mean there is *no right in the first place.* By analogy, we allow parental rights to be terminated when the health and well-being of a child are threatened; yet that doesn't alter the reality that parents have a fundamental right to raise their own children. *See, e.g., In re A.M.*,

Second, to the extent the majority invokes the democratic process and today's political actors, it bears noting that the legislature has decided not to finish the democratic process that it started. To date, the 90th General Assembly has not submitted for a popular vote the abortion-related constitutional amendment that the 89th General Assembly approved. *See* 2021 Iowa Acts ch. 187, § 2. That amendment would add a new section to article I of the Iowa Constitution, stating,

> Sec. 26. **Life.** To defend the dignity of all human life and protect unborn children from efforts to expand abortion even to the point of birth, we the people of the State of Iowa declare that this Constitution does not recognize, grant, or secure a right to abortion or require the public funding of abortion.

*Id.*

This hesitation to go to the people suggests that there may be two different forms of consensus: one in the legislature and another in the privately held views of Iowans on this intensely personal matter.

Along the same lines, it is also worth noting that Iowa's abortion laws have never targeted the person who has an abortion, only the abortion provider. Existing Iowa law does not prohibit a pregnant woman from performing a medication abortion herself. This approach seems to be unique in our law. Where else do we punish the aider-and-abetter but not the person they aid and abet? This tells me that, in the end, all of us—even those who supported the enactment of chapter 146E—may feel uncomfortable about blaming a woman who has had an abortion. To put it another way, even abortion opponents seem to recognize that there is a zone of personal autonomy that the state should leave alone—or at least not regulate directly.

---

843 N.W.2d 100, 112–13 (Iowa 2014). So, I disagree with *Dobbs*'s effort to separate the abortion decision from all other decisions made by a woman over her own body.

Moreover, in such a deeply private matter, I suspect none of us—particularly if we are men—know the truth. "Only a Woman, divine, could know all that a woman can suffer." Willa Cather, *Death Comes for the Archbishop* 173 (Virago Press 1981) (1927). I am certain that many women who are close friends and relatives of mine have made a personal decision to have an abortion during their lifetime, while I remain ignorant of that fact.

**IV. The Fundamental Right to Bodily Autonomy Embraces the Decision to End a Pregnancy; State Laws and Regulations That Deny a Reasonable Opportunity to Make that Decision Are Invalid.**

I believe the right of autonomy over one's body includes a limited but realistic opportunity to end a pregnancy. Thus, I continue to disagree with my colleagues in 2018 who found a wide-ranging fundamental right to an abortion with no endpoint other than birth. *See PPH 2018*, 915 N.W.2d at 249 (Mansfield, J., dissenting). But I also differ with today's majority that finds *no* right to terminate a pregnancy at all. I agree with Chief Justice Roberts's opinion concurring in the judgment in *Dobbs v. Jackson Women's Health Organization*, where he reasoned that the underlying logic of *Roe* does not require the woman's right to terminate a pregnancy to extend until viability, that the viability rule does not take into account other human concerns such as the prevention of fetal pain, and that a rule allowing abortions up until the sixteenth week would provide a reasonable opportunity to make a decision to end a pregnancy. 597 U.S. 215, 351–52, 356 (2022) (Roberts, C.J., concurring in the judgment). As he stated, "[T]here is nothing inherent in the right to choose that requires it to extend to viability or any other point, so long as a real choice is provided." *Id.* at 354.

Therefore, I would evaluate state regulations and restrictions on abortions *before* the sixteenth week using intermediate scrutiny and the *Casey* undue

burden standard. *See Planned Parenthood of Se. Pa.*, 505 U.S. at 877–78. This means that the state could not selectively ban telemedicine for abortions while allowing it for all other medical procedures. *Planned Parenthood of the Heartland, Inc. v. Iowa Bd. of Med.* (*PPH 2015*), 865 N.W.2d 252, 269 (Iowa 2015). But reasonable waiting periods of twenty-four or perhaps even seventy-two hours could be upheld if they are part of a good-faith effort to ensure a fully informed decision. *PPH 2018*, 915 N.W.2d at 250 (Mansfield, J., dissenting). After the fifteenth week, the State could ban abortion in the absence of a special circumstance.

My colleagues in the majority echo the *Dobbs* majority in criticizing the undue burden standard as unworkable, but I think they are on the wrong side of that debate. The undue burden standard requires us to "weigh the extent of the burden against the strength of the state's justification in the context of each individual statute or regulation." *PPH 2015*, 865 N.W.2d at 264 (quoting *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 914 (9th Cir. 2014), *abrogated by Dobbs*, 597 U.S. 215). We did not have difficulty applying that standard to telemedicine, unanimously, in 2015. As I explained in my 2018 dissent, prior to *Dobbs*, the undue burden test had resulted in a fairly consistent and predictable jurisprudence on waiting periods. *See PPH 2018*, 915 N.W.2d at 250–52.

True, as new restrictions on abortion emerged, it became necessary to litigate them under *Casey*. But this occurred largely because states had repeatedly and intentionally tested *Casey*'s boundaries in ingenious ways. Would we say that *Brown v. Board of Education*, 348 U.S. 886 (1954), was unworkable because some states repeatedly tested *its* boundaries after 1954?

Conceptually, the undue burden test—like the *Anderson-Burdick* test in election law cases—allows courts to make "hard judgments," giving deference where appropriate to legislative judgment while prohibiting out-and-out

obstruction of the right.[53] As the majority states, "Intermediate scrutiny for election laws . . . allows courts to balance competing constitutional requirements of ensuring fair and orderly elections against the right to vote." No one on our court suggests the *Anderson-Burdick* test is unworkable for the election cases we have seen repeatedly in recent years; rather, we have adopted it under the Iowa Constitution. *See Democratic Senatorial Campaign Comm.*, 950 N.W.2d at 6–7. If a form of intermediate scrutiny that balances the weight of different interests is workable in the context of voting, what makes it so unworkable when applied to abortion?

More to the point, workability isn't just a question of how much "work" judges have to do when they apply a legal rule. We consider the practical effects of the rule on society as a whole. For example, in *Burnett v. Smith*, we decided to overrule *Godfrey v. State*, 962 N.W.2d 84 (Iowa 2021), a case that recognized a direct cause of action for damages under the Iowa Constitution. 990 N.W.2d 289, 307 (Iowa 2023). We noted that *Godfrey* was legally wrong and had complicated our jurisprudence. *Id.* at 298, 304. We found that it had also become a vehicle for asserting either meritless claims of constitutional violation in otherwise nonconstitutional cases or duplicative claims of state constitutional violation in cases where claims under 42 U.S.C. § 1983 were already available. *Id.* at 301–03.

---

[53] *See Anderson v. Celebrezze*, 460 U.S. 780, 789–90 (1983) ("Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. The results of this evaluation will not be automatic; as we have recognized, there is 'no substitute for the hard judgments that must be made.' " (citations omitted) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974))); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992) ("[A] more flexible standard applies. A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' " (quoting *Anderson*, 460 U.S. at 789)).

A rational basis standard governing abortion may not be difficult for Iowa judges to administer, but we need to examine its broader effects. Under the majority's new legal framework, we now ask only if an abortion restriction is rationally related to a legitimate state interest. Realistically, rational basis review means that practically *any* ban or restriction on abortion will be upheld. Supposedly, *Racing Ass'n of Central Iowa v. Fitzgerald* (*RACI*), 675 N.W.2d 1 (Iowa 2004), changed the law so that Iowa now follows a rational basis test "with teeth." *See, e.g.*, *AFSCME Iowa Council 61 v. State*, 928 N.W.2d 21, 35 (Iowa 2019). But those teeth have had no bite; by my count, we have decided approximately forty rational basis cases since *RACI*, and we have never sustained a rational basis challenge to a law or regulation.[54] Today's case makes that forty-one.

Chapter 146E will severely restrict abortions in Iowa. In most instances, unless costs are too much of a barrier, the woman living in Iowa who wishes to end a pregnancy will get an abortion by heading to Illinois, Minnesota, Nebraska, or Wisconsin. To that extent, things won't change. But the availability of healthcare will change. Medical students and practicing ob-gyns will elect not to come here in the first place, or they may pick up and leave. One-third of Iowa counties are already classified as "maternity care deserts." *See* March of Dimes, *Where You Live Matters: Maternity Care in Iowa* 1 (2023), https://www.marchofdimes.org/peristats/assets/s3/reports/mcd/Maternity-Care-Report-Iowa.pdf [https://perma.cc/2DL4-GDXB]. This will get worse.

---

[54] *See Behm*, 922 N.W.2d at 578 (Waterman, J., concurring) ("*RACI II*, as a practical matter, has been limited to its facts. We have never relied on *RACI II* to strike down another municipal or state legislative enactment.").

**V. Iowa Code Chapter 146E Denies a Woman an Opportunity to Make a Decision Not to Have the Child and Is Therefore Unconstitutional.**

In my view, the near-universal ban on abortions after the sixth week in Iowa Code chapter 146E directly and substantially interferes with the woman's fundamental right not to procreate. At the sixth week, a woman may not even know she is pregnant and has almost certainly not sought medical care for her pregnancy. The six-week mark does not allow enough time for a woman to make a decision whether or not to carry a pregnancy to term. The adoption of this timing is not accidental: Iowa Code chapter 146E is designed to end, and will end, most abortions in Iowa. Therefore, the law is an undue burden on a woman's constitutional right to exercise autonomy over what happens within her body and to decide whether or not to have a child.

Life is messy. There are pregnancies that result from failed birth control, from intoxication, from pressure to have sex that doesn't legally amount to rape, from false promises by the father-to-be, from a youth's lack of impulse control, and so on. These are just a few examples. Many of these situations would not be considered "voluntary" under our law. *See, e.g.*, *State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009) (defining "voluntary" as "the product of . . . free and deliberate choice rather than intimidation, coercion, or deception"); *State v. Garcia*, 756 N.W.2d 216, 220 (Iowa 2008) (equating "voluntary" with "freely made, uncoerced, reasoned, and informed"). So, the net effect of the six-week ban is that it forbids many women from ever making a truly voluntary decision to have children or not. That is unacceptable to me.

Again, I acknowledge the deep sincerity and goodwill of all who support chapter 146E. They believe that life begins at conception and that any abortion is the killing of a human being. But I can't help thinking that if the arguments against abortion were as powerful as the supporters of chapter 146E think they

are, they would persuade any woman who becomes pregnant. Coercive laws would not be needed. Indeed, I find it somewhat ironic that after initially enacting laws intended to allow a pregnant woman to make *a more considered decision*, see 2017 Iowa Acts ch. 108, § 1 (codified at Iowa Code § 146A.1 (2018)) (mandating waiting periods and the provision of information); 2020 Iowa Acts ch. 1110, § 2 (codified at Iowa Code § 146A.1 (2021)) (same), the legislature now has determined that—as a practical matter—she shouldn't be able to make a decision *at all.*

In the end, the question in this case is whether a woman has a constitutional right of autonomy over her body as part of the due process guarantee of liberty. If she does, and I believe she does, then a law that takes away any realistic opportunity to decide not to carry a pregnancy to term violates article I, section 9. Because Iowa Code chapter 146E is unconstitutional, I would affirm the temporary injunction enjoining it from taking effect.

For the foregoing reasons, I respectfully dissent.

Christensen, C.J., and Waterman, J., join this dissent.